Donald J. Yannella, Esq.
233 Broadway, Suite 2370
New York, New York   10279
(212) 226-2883
Email:  nynjcrimlawyer@gmail.com
Attorney for Petitioner

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————————

SHELDON THOMAS,                                    AMENDED PETITION
                                                                      FOR A WRIT OF
                          Petitioner                           HABEAS CORPUS
                                                                      BY A PRISONER IN
                                                                      STATE CUSTODY

              - against -

STATE OF NEW YORK,                              11-CV-1119 (AMD)
BRIAN FISHER, D.O.C.S.

                          Respondent

———————————————————————————


## **INTRODUCTION**

1.        Petitioner Sheldon Thomas is incarcerated in violation of the United States Constitution
at Elmira Correctional Facility, Elmira, New York, by Paul Chappius, Superintendent.

2.        By his undersigned pro bono counsel, Mr. Thomas hereby submits for filing this first
amended petition for habeas corpus relief pursuant to 28 U.S.C. §§2242, 2254.  This amended
petition is intended to supersede Mr. Thomas's initial pro se petition, filed in this Court on
March 2, 2011.[1]

3.        Filing of an amended petition is permitted without leave of court where, as here, it occurs
prior to the state's filing of a responsive pleading to an original petition.  See Rule 12 of the
Rules Governing §2254 cases in the United States District Courts (authorizing application of
Federal Rules of Civil Procedure where not inconsistent with §2254 Rules); Federal Rule of
Civil Procedure 15(a) (authorizing one amended pleading without leave of court prior to filing of

---

[1]  ECF Doc. 1.

1

responsive pleading).  See also 28 U.S.C. §2242 (permitting an amendment or supplement "as provided in the rules of procedure applicable to civil actions").

4.     Furthermore, under the applicable civil rules, the date of filing the instant amended petition is deemed to relate back to the date of filing the original petition which, in this matter, was March 2, 2011.  See §2254 Rule 11; Fed. R. Civ. Proc. 15(c) (amended pleading relates back to original where, inter alia, the claims, as here, arise out of the conduct, transaction, or occurrence set forth in original pleading).

5.     Mr. Thomas was one of seven young men who became suspects in a drive-by murder after an informant, Aliyah Charles, told police the surviving victims' guesses and speculations about who might have done the shooting.

6.     Only three of the seven persons Ms. Charles named as "possible" perpetrators were investigated.  Of those three, one was dismissed from the case on the prosecutor's own motion before trial.  The other was acquitted.  Only Mr. Thomas remained, convicted of the murder of Anderson Bercy solely on the testimony of two teenagers with personal and gang-related motives to fabricate their identifications (one of whom was Ms. Charles herself).

7.     At trial, these two witnesses actually identified Mr. Thomas as two entirely different participants in the crime—rendering at least one of the identifications, of logical necessity, wrong.

8.     These false and unreliable identifications were obtained by police, and used at trial, in violation of Petitioner's rights under the United States Constitution.

9.     There was no other evidence against Mr. Thomas, and, from the time of his arrest, he has steadfastly maintained his innocence of the crime charged.

10.    Mr. Thomas's appointed trial lawyer was disastrously confused and incompetent throughout the pretrial and trial proceedings.  Among other failures, he failed to challenge the admissibility of any of the People's proffered identifications on due-process grounds of suggestiveness and unreliability; failed to preserve any of the viable identification issues for appellate review; and, worst of all, acted as a virtual second prosecutor at trial, eliciting untrue and prejudicial testimony against his own client, including otherwise inadmissible testimony about an additional, unreliable, and repudiated identification of Mr. Thomas.

11.    Mr. Thomas was found guilty of second degree murder on November 1, 2006, and was sentenced to imprisonment for 25 years to life.

12.    Mr. Thomas sought and obtained several stays and extensions of time from this Court for the purpose of exhausting his state remedies.[2]  Those remedies have now been exhausted.

13.    Petitioner was granted leave to proceed in forma pauperis.[3]

---

[2]  ECF Docs.10, 11, 15, 17, 19, 24, 28, 32.

**ATTACHMENT OF CERTAIN PERTINENT PARTS OF THE RECORD and
INCORPORATION BY REFERENCE OF THE REST OF THE STATE RECORD**

14.     Counsel attaches to this filing certain pertinent parts of the record relating to the
allegations in the Petition, including selected portions of the court transcripts,[4] and hereby
incorporates by reference the entire state court record of the case.

15.     Certain documents submitted to the state courts were the best copies available to
Petitioner's counsel, including redacted documents and photocopies of photographs.  The Kings
County District Attorney's Office did not provide the state courts with better copies, although it
has the original documents and presumably the best copies.  The documents submitted herewith
(listed in an Index at the end of the Petition) are likewise the best copies available from counsel's
file.  Some documents, such as photos, may be clearer if submitted in hard copy to the Court.
Respondents should be able to obtain better copies from the Kings County District Attorney's
Office.

## FACTUAL BACKGROUND

**The Drive-by Murder and Initial Investigation**

16.     Anderson Bercy, a 14-year-old belonging to an East Flatbush gang, the Gangster Killer
Bloods,[5] was walking south on East 52nd Street at around 9:00 p.m. on December 24, 2004, with
fellow Bloods, including Kirk Lapaix, Freddy Patrice, Michael Barnwell, Daymeon Smith, and
Kadeem Drummond.[6]  As they arrived at the northwest corner of Snyder Avenue, a white car
pulled up alongside, and two shooters opened fire from the passenger side.[7]  The victims fled in
different directions as the white car continued westbound on Snyder and the shooters continued
to fire.[8]

17.     Bercy, running westbound with Patrice, collapsed at the corner of 51st Street, shot in the
upper chest.  Patrice helped Bercy down another block and around the corner of Snyder and

---

[3]  ECF Doc. 4.

[4]  Key to citations to the record:

     Exhibits attached to this electronic filing, Exs. 1 to 32, are listed in an Index at the end of
the Petition.

     Court transcripts:

     HT—Pretrial Hearing transcript (June 5, 6, 8, 12, 13, and 26, 2006).

     TT—Trial Transcript (Oct. 10, 12, 16, 17, 18, 19, 23, 24, 26, and 30, and Nov. 1, 2006).

[5]  TT 598, 656, 742 (Daymeon Smith).

[6]  E.g., TT 595–603, 774–75 (Smith); TT 1225 (Drummond).

[7]  TT 665–74 (Smith).

[8]  See, e.g., TT 670–74 (Smith); Ex. 1 (DD5 #16, 12/24/04) (Barnwell).

Utica, and called 911.[9]  Smith and Drummond, having run in the other direction, circled back and re-joined Patrice and Bercy.  Bercy died soon thereafter.[10]

18.     Detective Michael Martin of the Brooklyn South Homicide Squad paired up with Detective Robert Reedy of the 67th Precinct to head the investigation.[11]  Drummond, who had been shot in the shoulder, told Detective Martin at Kings County Hospital that, although he had not seen the shooters, he believed one of them might be a person he called "Yellow."[12]

19.     Detective Katranakis of the 69th Precinct went to Lapaix's second-floor apartment, whose windows looked out onto the corner of 52nd Street and Snyder Avenue.  Lapaix's brother told Detective Katranakis that he had heard shots, gone to the window, and seen the white car drive away.

20.     Lapaix's eighteen-year-old girlfriend, Aliyah Charles, told Detective Katranakis much the same.[13]  Lapaix himself did not make himself available to be interviewed that night.

21.     Two days later, December 26, 2004, Drummond again told Detective Martin that, although he did not know who the perpetrators were, he had heard that one of them was a person he called "Yellow."[14]

22.     That same day, Aliyah Charles went to the 67th precinct to tell Detectives Martin and Reedy that she had heard from her friends (members of the victim group) the names and nicknames of seven individuals who were "possibly in the car"[15]—Yellow, Smokey, Shelly/Sheldon Thomas, Kern, Has, O'Neil, and Chris.[16]  This was information that Ms. Charles had "heard going on in the street."[17]

23.     Detective Martin, who worked out of the Brooklyn South Homicide Squad, learned from 67th Precinct detectives that "Yellow" was Dalton Walters, from the local "Outlaws" gang, who was said to have recently threatened members of the victim group.

24.     Detective Martin also learned from 67th Precinct detectives that "Sheldon Thomas," known to be a member of the neighborhood set of the Crips gang, lived at 384 East 48th Street, and that "Kern" was Ernesto Sergeant, who was apparently not a gang member.

---

[9]  TT 1437–40 (Patrice).

[10]  TT 673–78 (Smith); TT 1236–37 (Drummond).

[11]  HT 288 (Martin).

[12]  Ex. 2 (DD5 #17, dated 12/24/04) (interview of Kadeem Drummond).

[13]  Ex. 3 (DD5 #14, dated 12/24/04) (Det. Katranakis).

[14]  Ex. 4 (DD5 #30, dated 12/26/04) (interview of Kadeem Drummond).

[15]  HT 289–90 (Det. Martin).  Ms. Charles is referred to throughout the suppression hearing as "confidential witness number one," and the documents and testimony establish "confidential witness number one" to be Aliyah Charles.

[16]  HT 289–90 (Det. Martin); Ex. 5 (Det. Martin's spiral notebook); HT 426 (Det. Martin).

[17]  HT 348 (Det. Martin).

25.     The others mentioned by Ms. Charles in her tips (Smokey, Has, Chris, O'Neil) were for unknown reasons never investigated.

26.     Also on December 26, Aliyah Charles's friend Daymeon Smith, one of the members of the Bloods victim group, came into the precinct and told Detective Martin that he had seen one of the passenger seat windows open, from which a gun emerged, fired by a dark-skinned black male wearing a dark blue "muffin" hat.[18]  From Mr. Smith's testimony at trial, by "muffin" hat, he meant a winter hat with ear flaps (muffs) covering the ears.[19]  Mr. Smith told detectives that he did not know this person's name but he could identify him if he saw him again.[20]  Yet the detectives did not ask Mr. Smith to search through mug shots for this person who was purportedly familiar to him yet whose name he did not know.  Mr. Smith did not provide any particularized information about this person—where he lived or hung out, what gang he belonged to, nothing.

**The identification procedures**

27.     When Ms. Charles on December 26 passed along tips from her friends to the case detectives, she gave no physical descriptions of any of the perpetrators.

28.     Nor did Ms. Charles give the police any information indicating any personal knowledge of their identities.

29.     Nor did Ms. Charles give the police any description of any personal observation of the individuals at the time of the crime, nor even any second-hand observations of anyone else.

30.     Nevertheless, the next day, December 27, 2004, Detective Martin showed Ms. Charles photospreads, intended to contain photos of two of the individuals she had named in the tips she had passed along from her friends—Dalton Walters ("Yellow") and Sheldon Thomas.

31.     Detective Martin made a mistake, however, in composing the photo array intended to contain a photo of Petitioner (Sheldon Thomas of 384 East 48th Street).  Detective Martin was not personally familiar with Petitioner.  In seeking a photo for the photospread, he used a computer database, and mistakenly obtained the photo of an entirely different individual named "Sheldon Thomas,"[21] and placed this photo in the #5 spot in the photospread.[22]

32.     Hence, Detective Martin mistakenly believed that the photo in the #5 spot was the individual Ms. Charles had intended to name in her street tips as "Sheldon Thomas," i.e., Petitioner Sheldon Thomas, of 384 East 48th Street.

---

[18]  Ex. 6 (DD5 #34, dated 12/27/04) (interview of Daymeon Smith).
[19]  See TT 669, 800 (Daymeon Smith).
[20]  Ex. 6 (DD5 #34, dated 12/27/04) (interview of Daymeon Smith).
[21]  HT 300, 450.
[22]  Ex. 7 (photospread, 12/27/04).

33.     On the evening of December 27, 2004, he and Detective Reedy went to the Lapaix apartment, where the victim group congregated, to show the two photospreads to Ms. Charles.[23] Detective Martin showed her the first photospread, and as he stood at her side, she selected #5 in the photospread, the other Sheldon Thomas (herein referred to as "#5 in the photospread" or "the wrong Sheldon Thomas") as "one of the guys in the white car."[24]

34.     Also with Detective Martin standing at her side, Ms. Charles then selected Dalton Walters from the other photospread, as one of the shooters.

35.     The next day, in the early hours of December 28, 2004, Petitioner Sheldon Thomas and Mr. Walters were both arrested at their respective homes, on the basis of these photospread selections by Aliyah Charles.

36.     During Detective Martin's interrogation of Petitioner, when Petitioner denied having participated in the crime, Detective Martin showed him the photospread, claiming that numerous witnesses had identified his photo.  Petitioner looked at it and pointed out that his photo was not in the photospread.[25]

37.     At that point, Detective Martin realized that Ms. Charles had chosen a photo, not of Petitioner Sheldon Thomas, but of a person unrelated to the case and to the neighborhood (the wrong Sheldon Thomas, #5 in the photospread, Ex. 7).

38.     Therefore, as of that point in time, the detectives now had no reason in law or in fact to continue to hold Petitioner in the precinct against his will.

39.     The detectives, however, failed to release Petitioner.  They continued to hold him in the precinct against his will, in violation of the Fourth Amendment.

40.     Furthermore, Detective Martin also now knew that Ms. Charles had chosen a photo of the very person he had believed to be the person she had named in her tips as "Sheldon Thomas."

41.     Hence, Detective Martin should have known that Ms. Charles had nothing to contribute to this case in regard to identifications of individuals, and certainly not of Petitioner, because she had merely followed police cues (whether conscious or unconscious) during the photospread viewing procedure.

42.     But despite knowing these things, two hours later, still in violation of the Fourth Amendment, the detectives forced Petitioner to stand in a lineup.  Making no effort to prevent cueing influences, they brought Ms. Charles back to the precinct to select Petitioner from the

---

[23]  HT 305–10, 382; TT 1561–64 (Martin).

[24]  HT 307–08 (Martin).  Ms. Charles placed the initials "AC" under photo #5.  Ex. 7 (photospread, 12/27/04).

[25]  HT 322–23, 442–43.

lineup, which, in the presence of both case detectives, she did.  Ms. Charles also selected co-defendant Walters from a lineup.  She then left the station.[26]

43.   Two hours later, having obtained Ms. Charles's fabricated identification of Petitioner, the detectives brought two of Ms. Charles's friends, fellow Bloods Daymeon Smith and Freddy Patrice (members of the victim group), to the precinct to view lineups.

44.   Daymeon Smith allegedly "recognized" Mr. Thomas as one of the shooters, and "recognized" Mr. Walters as someone he knew.[27]  Freddy Patrice allegedly "recognized" both Mr. Thomas and Mr. Walters as shooters.[28]

45.   Neither signed a lineup form, and Patrice later denied at trial that he had made any such identifications ("recognitions").[29]

46.   Petitioner's arrest photo, taken on December 28, 2004, shows his appearance, including hairstyle, at the time of his arrest and for many months before that.[30]

47.   Some weeks later, Detective Martin showed Ms. Charles another photospread, this time with Ernesto Sergeant ("Kern") as the target.   Again with Detective Martin standing right next to her, Ms. Charles chose Sergeant's photo as "one of the individuals in the car."[31]

48.   On the basis of these identifications, Mr. Thomas, Mr. Walters, and Mr. Sergeant were indicted under Kings County Indictment No. 08251-04.

49.   Under the District Attorney's guidelines, Detectives Reedy and Martin now had to arrange for a double-blind corporeal lineup of Ernesto Sergeant.  This time, under blind conditions, Ms. Charles did not identify Mr. Sergeant.[32]

50.   Thus, of the six photo and corporeal lineup identification procedures participated in by Aliyah Charles, the only time she did not make a selection of the individual who was viewed as the target by police was when it was conducted blind.

51.   Given all the circumstances—her lack of any previous claim to actual observation; her failure to give any description, her selection of the #5 in the photospread (the wrong Sheldon

---

[26]  See, e.g., HT 336, 349, 353–58 (Det. Martin).

[27]  HT 361–62 (Det. Martin); Ex. 8 (DD5 #42, dated 12/28/04); HT 55 (Det. Reedy).  See also TT 685 (Smith).

[28]  HT 363–65 (Det. Martin); Ex. 9 (DD5 #43, dated 12/28/04).

[29]  See Ex. 9 (DD5 #43, dated 12/28/04).  Patrice denied at trial that he had viewed any lineups at all.  TT 1446–49.

[30]  Ex. 10 (Petitioner's arrest photo, 12/28/04); Ex. 11 (affid. of Sheldon Thomas, dated 11/14/11), ¶35.

[31]  HT 368–70, 418–21 (Det. Martin); Ex. 12 (DD5 #51, dated 1/21/05).

[32]  HT 540–49 (Det. Manceri).

Thomas) followed by her selection of Petitioner, both times in the presence of potentially powerful cueing influences; her selection of Mr. Sergeant's photo in a non-blind condition followed by her non-identification in a blind condition—it is clear that in every non-blind circumstance, Ms. Charles merely followed police cues and was unqualified to make any identifications at all.[33]

**The suppression hearing**

52.    A suppression hearing was held in regard to various motions made by the defendants' respective attorneys before the Hon. Vincent M. Del Giudice.  The pretrial hearing began on Monday, June 5, 2006.

53.    An open scandal erupted when Detective Robert Reedy was caught falsely testifying that "witness #1" (Aliyah Charles) and "witness #2" (Daymeon Smith) had selected Petitioner's photo from the photospread.  The prosecution, caught by surprise, disclosed that in fact Petitioner's photo was not in the photospread,[34] and Petitioner's trial counsel, Steven J. Chaikin, also caught by surprise, moved to suppress the lineup identifications on the ground that there had been no probable cause for Petitioner's arrest, because his photo was not in the photospread.[35]  In the midst of this budding mini-scandal, the Court adjourned to give Detective Reedy an opportunity to obtain counsel, and then adjourned yet again over an entire weekend.[36]

54.    On Monday, June 12, accompanied by counsel, Reedy retracted his prior false testimony and explained his reasons for having given it.[37]

55.    In addition to this purging exercise, Detective Reedy testified that Detective Martin had reminded him over the weekend that he (Detective Martin) had received an anonymous call about Petitioner.[38]

56.    Detective Martin then took the stand.  Closely examined, his testimony shows that, before Aliyah Charles participated in the photo array identification procedures on December 27, she had not given him any statement of any personal knowledge as to the identities of the perpetrators.[39]

---

[33]  This information is summarized in Ex. 13 (witness chart and timeline with full citations to the record).

[34]  HT 147–48.

[35]  HT 162.

[36]  HT 167–72; HT 191–99; Ex. 14 (Alex Ginsberg, Bungler Cop Red in Face, New York Post (June 12, 2006)).

[37]  For example, there was no DD5 documenting the mix-up, HT 222; he had been confused; HT 202–11; it was Detective Martin who had conducted all the procedures, HT 209, HT 231 (etc.).

[38]  HT 213, 215–16.

[39]  See, e.g., HT 289–90. (Det. Martin).  Detective Martin started to testify cagily about this late in the hearing, however.  Suddenly he claimed on cross-examination that Ms. Charles had told him on December 26 from her personal knowledge that Yellow was in the white Nissan firing a handgun, HT 492.  Based on Detective Martin's prior testimony at HT 289–90, 465–68, 490, and elsewhere, on the contents of his spiral notebook, that appears to be clearly untrue, and in any

57.     Detective Martin then supported Detective Reedy's story about an anonymous call to the precinct, which had "rehashed" the information that Aliyah Charles gave him.  But, closely examined, Detective Martin's testimony disclosed that there was no DD5 documenting the call; he did not know exactly what the tip was; he could not remember who had told him about it; and he did not know who had received it.[40]

58.     The People justified the arrest of Petitioner by asserting that the anonymous call, combined with Aliyah Charles's street tips, contained enough information to give the police probable cause to arrest Petitioner.

59.     There was no testimony to support this assertion.

60.     The People also explained Ms. Charles's selection of a different person (#5 in the photospread) by asserting a "remarkable" resemblance between that person and Petitioner.[41]

61.     That claim was entirely specious.[42]

62.     Petitioner's trial counsel argued that Aliyah Charles's selection from of the photospread of a different person named "Sheldon Thomas" did not give police probable cause to go to Petitioner's house to arrest him.  Trial counsel suggested that #5 in the photospread was a better suspect for the crime, and did nothing to dispute the People's claim that there was a confusable resemblance between Petitioner Sheldon Thomas and #5 in the photo array, nor to point out that there was no testimony of personal knowledge by Aliyah Charles or anyone else.  Trial counsel also failed to submit a post-hearing brief.

63.     Trial counsel failed to move to exclude Aliyah Charles's proffered in-court identification on the ground that she had demonstrated herself to be unqualified to identify Petitioner, and failed to move to exclude any of the identifications on the ground that the identification procedures were unduly suggestive and that the resulting identifications were inadmissible under the Due Process Clauses of the State and Federal Constitutions (absent a showing of reliability at an independent source hearing, which was never held or even asked for).

**The suppression court's decision on the Fourth Amendment claim**

64.     On July 13, 2006, the suppression court issued its written denial of Petitioner's Fourth Amendment claim.[43]  The suppression court adopted the People's theory of a resemblance

---

event says nothing about Petitioner.  See TT 1123–26.  Detective Martin's spiral notebook is attached as Ex. 5.  In addition, it later turned out that Ms. Charles told ADA Marrone on December 26 that she had not seen the driver's face, TT 1123–26, yet at trial she claimed Petitioner was the driver.  TT 1138.  See also below at ¶249.

[40]  HT 376–79, 446–49 (Det. Martin).

[41]  Ex. 15 (affirm. of ADA Rodriguez, 6/29/06).

[42]  Compare Ex. 10 (Petitioner's arrest photo, 12/28/04), with Ex. 7 (photospread, 12/27/04). Ms. Charles's selection is #5.

between #5 in the photo array and Petitioner, and held that probable cause to arrest had been based on information from "Kadeem Drummond and Confidential Witness #1 [Aliyah Charles], as well as verified information received from unknown callers, identifying [Petitioner Sheldon Thomas] as one of the perpetrators."[44]

65.    This assertion by the suppression court was both factually inaccurate and contrary to clearly established Federal law, from beginning to end, as will be shown in Claim I below at ¶¶147–170.

66.    Petitioner's trial counsel did nothing to attempt to correct the factual errors or to brief the legal issues.  In fact, he never evinced any awareness of what the actual facts were.

67.    Although the suppression court did not suppress Ms. Charles's alleged identifications of Ernesto Sergeant ("Kern"), the following month the District Attorney moved to dismiss the indictment against Ernesto Sergeant, thus showing that intervening circumstances had demonstrated that Ms. Charles's supposed identification of Mr. Sergeant was indeed inaccurate.

**The Trial**

68.    The two remaining defendants, Petitioner Sheldon Thomas and Dalton Walters, were tried before the Honorable Vincent Del Giudice, J.S.C., and a jury on October 10, 12, 16, 17, 18, 19, 23, 24, 26, and 30, and November 1, 2006.

69.    The two eyewitnesses proffered by the prosecution to identify Petitioner were Daymeon Smith and Aliyah Charles.  It turned out at trial that these witnesses were actually identifying Petitioner Thomas as two entirely different participants in the crime.

70.    Daymeon Smith identified Petitioner as a dark-skinned perpetrator seated in the front passenger seat, wearing a winter hat with ear flaps covering the ears, who rolled the front passenger window down and thrust a gun out, upon which Mr. Smith turned around, cried out and ran to his left, in the opposite direction from the car.[45]

71.    Asked if Petitioner, in his view, was dark-skinned, he answered "No."[46]

72.    Mr. Smith testified that he was familiar with Petitioner's face from riding through Crips territory, and knew where he lived and the friends he hung out with in the Forties,[47] but Mr.

---

[43]  Ex. 16 (dec'n and order of Justice Del Giudice, slip op., 07/13/06), at 16–17.  This decision pertained to the omnibus hearing held on all three defendants—Dalton Walters, Sheldon Thomas, and Ernesto Sergeant.  Petitioner's case is dealt with on pages 16–17.
[44]  Id. at 16–17.
[45]  TT 66–73.
[46]  TT 800–02.
[47]  TT 654–55, 780.

Smith was not cross-examined about the fact that he had not told any of this to the police on December 26, when he first gave a description of a "dark-skinned" shooter to the police.[48]

73.     Aliyah Charles identified Petitioner as a different participant in the crime.  She identified Petitioner as having been seated in the driver's seat, hatless.[49]

74.     Also in direct contradiction to Daymeon Smith, Ms. Charles testified that she had seen Ernesto Sergeant ("Kern") shooting from the front passenger seat; she also testified that the shooter in the rear passenger seat was co-defendant Dalton Walters.[50]

75.     Petitioner's trial counsel did not cross-examine either Aliyah Charles or Daymeon Smith on the fact that neither one had made any description whatsoever corresponding to Petitioner Thomas, and certainly no description of his distinctive cornrow hairstyle, which Petitioner had at the time of the crime and for months before that.[51]

76.     Kirk Lapaix, Kadeem Drummond, and Freddy Patrice also testified for the People about the events of the fatal night, saying that, upon hearing shots fired, they had run and had not seen the shooters.

77.     Patrice denied having made any pretrial identifications.

78.     The prosecution did not call either Detective Reedy or Martin to testify.

79.     Mr. Thomas's trial counsel, however, did call Detective Martin to testify, inexplicably and knowingly eliciting that Mr. Patrice _had_ identified Mr. Thomas out of a lineup.[52]

80.     Trial counsel confusedly attempted to undo the damage in closing, to no avail,[53] and the prosecution's summation dwelt extensively on the alleged Patrice identification.[54]

81.     Trial counsel elicited other damaging, untrue, and otherwise inadmissible, testimony against his client[55] and committed other errors almost too numerous to list.

82.     On this evidence, the jury acquitted co-defendant Walters and convicted Petitioner Thomas.  No physical evidence or any other evidence besides the identifications described above tied Mr. Thomas to the crime.

---

[48]  See Ex. 6 (DD5 # 34, dated 12/27/04) (interview of Daymeon Smith).

[49]  TT 1138.  She said all four perpetrators were wearing jackets, but none was wearing a hat.  Id.

[50]  See, e.g., TT 937–43, 1130.

[51]  Ex. 10 (Petitioner's arrest photo, 12/28/04); Ex. 11 (affid. of Sheldon Thomas, dated 11/14/11), ¶35.

[52]  TT 1574–75.  The court had already ruled that the prosecution would not be able to do this. TT 1467–68.  See Claim II below at ¶¶234–246.

[53]  TT 1777-83; TT 1754-56.

[54]   TT 1846-49; TT 1852-53.  See Claim II below at ¶¶247–248.

[55]  See Claim II below at ¶¶ 249–251.

83.    Judgment was entered against Petitioner on January 30, 2007, and the court sentenced him to imprisonment for twenty-five years to life.[56]

## EXHAUSTION OF CLAIMS IN STATE COURTS

84.    Under 28 U.S.C. §2254(b)(1), a writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies by "fairly presenting" in state court both the operative facts and legal theory of his or her federal claims.  O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999).

85.    All of Petitioner's claims have been exhausted in New York courts.  Following is a summary of the prior proceedings relating to the instant amended petition and the exhaustion of Petitioner's claims:

**Direct appeal and coram nobis**

86.    Petitioner's assigned appellate attorney argued the issue that trial counsel had raised during the suppression hearing—that the police lacked probable cause for petitioner's arrest under the Fourth Amendment.

87.    On September 15, 2009, the Appellate Division, Second Department, upheld the suppression court's decision on appeal in People v. Thomas, 65 A.D.3d 1170 (2d Dep't 2009).[57] Leave to appeal was denied on January 6, 2010.[58]

88.    On September 1, 2010, Petitioner filed a pro se motion for a writ of error coram nobis, alleging ineffective assistance of appellate counsel for failure to litigate due process claims of suggestive identification procedures.  The Second Department denied this motion on December 28, 2010.[59]  Leave to appeal to the Court of Appeals was denied on June 29, 2011.[60]

**The CPL §440.10 motion**

---

[56]  Defendant was convicted of one count of second degree murder (N.Y. P.L. §125.25(1)), five counts of second degree attempted murder (N.Y. P.L. §§110/125.25(1), five counts of first degree attempted assault (N.Y. P.L. §§110/120.10(1)), one count of second degree assault N.Y. P.L. §265.03(2)).  He was sentenced to concurrent terms of imprisonment of twenty-five years to life for murder, ten years for each of the five counts of attempted murder, five years for each of the five counts of attempted assault, one term of five years in prison for assault, and two terms of five years' imprisonment for the two counts of criminal weapon possession.

[57]  Ex. 17 (People v. Thomas, 2d Dep't, slip op., Sept. 15, 2009) (denial of direct appeal) (reported as 65 A.D.3d 1170).

[58]  Ex. 18 (People v. Thomas, 13 N.Y.3d 942 (Jan. 6, 2010)).

[59]  Ex. 19 (People v. Thomas, 79 A.D.3d 1153 (2nd Dep't, Dec. 28, 2010).

[60]  Ex. 20 (People v. Thomas, 17 N.Y.3d 802 (June 29, 2011).

89.     Petitioner by pro bono counsel filed a CPL §440.10 motion to vacate Petitioner's conviction on December 12, 2011.

90.     The CPL §440.10 motion alleged that the lineup and in-court identifications of Petitioner by Aliyah Charles and Daymeon Smith were inadmissible because they failed to meet the minimal demands of due process and were patently unreliable.  The facts were marshaled and the allegations documented by all the record and dehors-the-record evidence bearing on these claims, including the photospread and Petitioner's arrest photo, which no court had ever considered before.[61]

91.     The motion argued that these claims were not barred under the applicable procedural provisions of the CPL §440.10 statute, but that, if they were held to be barred, Petitioner's trial counsel had been ineffective in having failed to litigate and preserve them for appellate and federal review.

92.     In addition, submitted as newly-discovered evidence under CPL §440.10(1)(g), was the report of Professor Brian Sheppard, explaining his study demonstrating that Aliyah Charles had selected from the photospread the face that looked second <u>least</u> like Petitioner.[62]  This provided powerful corroboration of the claim that her identification of him was fabricated.

93.     It was argued by CPL §440.10 counsel that if the court rejected this evidence as "newly discovered," it was evidence that trial counsel had been ineffective for failing to make a similar effort to show that there was no confusable resemblance between Petitioner and #5 in the photospread, and hence no reasonable explanation for Aliyah Charles to have selected #5 in the photospread, except for police cueing, and that therefore Ms. Charles had been unqualified to identify Petitioner.

94.     Many other failures of trial counsel were set out in detail as grounds for relief, which are hereby incorporated by reference.  Petitioner submitted an affidavit stating that he was innocent of this crime, and detailing his dealings with his trial counsel and counsel's failure to investigate,[63] together with affidavits of his mother and grandmother.[64]  Post-conviction counsel submitted a good deal of other record and dehors-the-record evidence, such as DD5's and detective notes, to support his allegations about counsel's numerous failures and derelictions at the suppression hearing and at trial.

---

[61]  The photospread is Ex. 7.  Petitioner's arrest photo is Ex. 10.

[62]  Ex. 21 (affid. and report of Brian Sheppard, dated 12/09/11) ("Sheppard study").  Professor Sheppard conducted this double-blind study of 32 members of the Black Law Students' Association chapters at Seton Hall and Rutgers Law Schools, to test whether young African-Americans could easily mistake #5 in the photospread for Petitioner, or would even select #5 as the photo most resembling Petitioner out of the six photos in the photospread.  The answer was a resounding No.

[63]  Ex. 11 (affid. of Sheldon Thomas, dated 11/14/11).

[64]  Ex. 22 (affid. of Petitioner's grandmother, Lurline Coke, dated 11/8/11); Ex. 23 (affid. of Petitioner's mother, Pauline Williams, dated 11/18/11).

95.    In answer to the claim of ineffective assistance of counsel, the People submitted an affirmation of trial defense counsel, in which counsel claimed that he had hired an investigator, interviewed witnesses, and presented an adequate defense.[65]

96.    In his affidavit, trial counsel failed even to mention Petitioner's most serious allegations—e.g., that he had elicited damaging and otherwise inadmissible testimony, including an additional identification, against his own client at trial.

97.    Trial counsel refused post-conviction counsel's request that he turn over his file in order that post-conviction counsel could examine the basis of his assertions about his investigation, his witness interviews, and his hearing and trial preparation.

98.    On June 5, 2012, the post-conviction court issued a 13-page order summarily denying relief, ruling that due-process claims surrounding the identifications were procedurally barred under CPL §440.10(2)(a), (2)(c), or (3)(a),[66] rejecting the claim of ineffective assistance of counsel on the merits,[67] and ruling that the Sheppard study was not "newly discovered."[68]

99.    The decision either ignored or mischaracterized the most important ineffective assistance claims in the CPL §440.10 motion,[69] but the order denying relief was nevertheless a plenary order on the merits of the entire claim.

100.    The post-conviction court denied post-conviction counsel's request to compel trial counsel to turn over his file.

101.    The Second Department granted leave to appeal and granted the Innocence Project leave to file an amicus brief in regard to the Sheppard study.

102.    On August 12, 2015, a panel of the Appellate Division denied the appeal, affirming the post-conviction court's ruling that Mr. Thomas's due process claims were barred under CPL §440.10(2)(a) or (2)(c), and denying the entire claim of ineffective assistance of trial counsel on the merits, saying that Petitioner had "failed to demonstrate the absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct."[70]

103.    The appellate decision, which, like the CPL §440.10 court before it, ignored most of the allegations of ineffective counsel and mischaracterized the rest, nevertheless was a plenary decision on the merits of the entire claim.

---

[65]   Ex. 24 (attorney affirmation of Steven J. Chaikin, Esq., dated 03/23/12).
[66]   Ex. 25 (decn. and order of Del Giudice, J., 06/05/12), slip op. at 5–10.
[67]   Id. at 7–10.
[68]   Id. at 10–12.
[69]   See id. at 8 (listing only a few grounds, and mischaracterizing most of them).
[70]   Ex. 26 (People v. Thomas, N.Y. Slip Op. 06526 (2d Dep't, Aug.12, 2015).

104.    The Court of Appeals denied leave to appeal on January 15, 2016.[71]

**TIMELINESS OF PETITION AND RELATION BACK OF CLAIMS**

105.    28 U.S.C. §2244(d)(1) requires a petitioner to file a federal petition for habeas corpus relief within a year of the latest of four alternative triggering dates, the one pertinent here being the date that the disputed state judgment became final upon conclusion of direct review. However, §2244(d)(2) states that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

106.    In this case, the judgment became final upon conclusion of direct review on January 6, 2010, when the Court of Appeals denied leave to appeal from the Appellate Division's denial of Petitioner's appeal.[72]

107.    The time for filing a §2254 petition was tolled less than nine months later, pursuant to §2244(d)(2), when Petitioner filed his motion for a writ of coram nobis, on September 1, 2010. The Second Department denied this motion on December 28, 2010.[73]

108.    Petitioner sought leave to appeal to the Court of Appeals.

109.    While Petitioner was waiting for the New York Court of Appeals to decide his motion for leave to appeal the denial of his coram nobis motion, the time for filing a §2254 petition was still tolled.  In an abundance of caution, and not knowing when the Court of Appeals would make its decision, Petitioner filed a pro se petition for federal habeas corpus relief on March 2, 2011, with three months to spare.

110.    Hence, that initial §2254 petition was filed in a timely manner, and was filed while the time to file was still tolled by Petitioner's application to the New York Court of Appeals, which was eventually denied, on June 29, 2011.[74]

111.    Petitioner sought from this Court, and was granted, stays and extensions of time within which to exhaust his state remedies, informing the Court that he intended to litigate Federal due process claims and claims of ineffective trial counsel in a N.Y. CPL §440.10 motion.[75]

112.    Pursuant to this Court's order granting a stay and extension of time to exhaust state remedies, Petitioner by pro bono counsel filed a N.Y. CPL §440.10 motion to vacate Petitioner's conviction on December 12, 2011.

113.    The Hon. Vincent Del Giudice, J.S.C., summarily denied the §440.10 motion on June 5, 2012.[76]

---

[71]  Ex. 27 (order of the New York Court of Appeals, Leslie E. Stein, J., 01/15/16).

[72]  Ex. 18 (People v. Thomas, 13 N.Y.3d 942 (Jan. 6, 2010)).

[73]  Ex. 19 (People v. Thomas, 79 AD3d 1153 (2nd Dep't, Dec. 28, 2010)).

[74]  Ex. 20 (People v. Thomas, 17 N.Y.3d 802 (June 29, 2011)).

[75]  ECF Docs.10, 11, 15, 17, 19, 24, 28, 32.

114.    Leave to appeal was granted by the Appellate Division, Second Department, in an order dated December 4, 2012.  The appeal was denied on August 12, 2015.  <u>People v. Thomas</u>, 2015 N.Y. Slip Op. 06526 (Aug. 12, 2015).[77]  Leave to appeal to the Court of Appeals was denied on January 15, 2016.[78]

115.    Throughout the entire time during which he was exhausting his state remedies after filing his §2254 petition on March 2, 2011, Petitioner sought and obtained stays and extensions of time from the Hon. Sandra L. Townes, U.S.D.J.  Those remedies have now been exhausted.

116.    As noted in the Introduction at ¶¶ 3, filing of an amended petition is permitted without leave of court where, as here, it occurs prior to the state's filing of a responsive pleading to an original petition.  See Rule 12 of the Rules Governing §2254 cases in the United States District Courts (authorizing application of Federal Rules of Civil Procedure where not inconsistent with §2254 Rules); Federal Rule of Civil Procedure 15(a) (granting one amended pleading without leave of court prior to filing of responsive pleading).

117.    Furthermore, under the applicable civil rules, the date of filing the instant amended petition is deemed to relate back to the date of filing of the original petition which, in this matter, occurred on March 2, 2011, with three months' margin of safety.  See §2254 Rule 11, <u>supra</u>; Fed. R. Civ. Proc. 15(c) (amended pleading relates back to original where, inter alia, the claims, as here, arise out of the conduct, transaction, or occurrence set forth in original pleading).

118.    Hence, this first amended petition is timely and relates back to the date of the original petition.

## <u>GROUNDS FOR RELIEF</u>

119.    This case arises under the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution.  The New York state courts' adjudications of the exhausted claims set forth below were contrary to, or involved an unreasonable application of, clearly established federal law, within the meaning of 28 US.C. §2254(d)(1), or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings within the meaning of 28 U.S.C. §2254(d)(2), or both.  See <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).

---

[76]  Ex. 25 (decn. and order of Del Giudice, J., 06/05/12) (denying CPL §440.10 motion).
[77]  Ex. 26 (People v. Thomas, N.Y. Slip Op. 06526 (2d Dep't, Aug.12, 2015)) (denying appeal from denial of CPL §440.10 motion).
[78]  Ex. 27 (order of the New York Court of Appeals, Leslie E. Stein, J., 01/15/16) (denying leave to appeal).

## CLAIMS FOR RELIEF

**I. THE FALSE AND UNRELIABLE IDENTIFICATIONS RESULTING FROM PETITIONER'S ILLEGAL DETENTION SHOULD HAVE BEEN SUPPRESSED AS THE FRUITS OF A FLAGRANT FOURTH AMENDMENT VIOLATION; THE STATE COURTS' ADJUDICATIONS OF THIS CLAIM WERE CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW AND WERE BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.  U.S. CONST. AMENDS. IV, XIV.  28 US.C. §2254(d)(1), (2).**

> **A. All lineup and in-court identifications were false and unreliable, and should have been suppressed as the fruits of the illegal detention of Petitioner in violation of the Fourth Amendment.**

**Aliyah Charles**

120.    As recited in the Factual Background at ¶¶27–33, Detective Martin had no reason to show photos to Aliyah Charles, because she had not provided any statements of personal knowledge of the identities of the perpetrators, only tips about "possible" perpetrators she had heard from her friends.  Nor had she provided descriptions that could be the basis for constructing photospreads with appropriate fillers.  However, on December 27, 2004, Detective Martin composed a photospread which he intended should contain a photo of Petitioner Sheldon Thomas, one of the individuals named by Aliyah Charles in her street tips. But in seeking a photo of Petitioner for the photospread, he mistakenly obtained the photo of an entirely different individual named "Sheldon Thomas."[79]  It is undisputed that this other Sheldon Thomas was a young person with no relation to the neighborhood, the victims, or otherwise to the case.  He is referred to herein as "#5 in the photospread" (or "the wrong Sheldon Thomas").  Detective Martin placed this photo in the #5 spot in the photospread.[80]

121.    Still on December 27, Detective Martin showed the photospread to Aliyah Charles.  With Detective Martin standing right next to her, Ms. Charles selected #5 from that photospread—the very person Detective Martin believed was Petitioner, but was actually a person unrelated to the case and unknown in the neighborhood.

122.    On the basis of Ms. Charles's selection of #5 in the photospread, Petitioner was arrested later that day, in violation of the Fourth Amendment.

123.    During Detective Martin's interview, Petitioner denied having participated in the crime and expressed disbelief at Detective Martin's statement that he had been identified by "numerous

---

[79]  Ex. 7 (photospread, 12/27/04); HT 300, 450.
[80]  Ex. 7 (photospread, 12/27/04).

witnesses." Detective Martin showed him the photospread. Petitioner pointed out that his picture wasn't in the photospread, which upon examination Martin had to admit was true.[81]

124.   It was at that moment that Detective Martin realized that he had made a mistake in composing the photospread, and that Ms. Charles had chosen a photo, not of Petitioner but of an irrelevant person. Therefore, whatever probable cause might have existed previously for Petitioner's arrest (which Petitioner does not concede; see ¶¶120–122), Detective Martin now had no legal reason to continue to hold Petitioner in the precinct. Petitioner should have been released.

125.   The detectives, however, failed to release Petitioner. Instead, they continued to hold him in the precinct, in clear violation of the Fourth Amendment.

126.   In fact, the detectives held Petitioner at the precinct while they set up a special lineup, just for Aliyah Charles, <u>specifically for the purpose of giving her a second chance to identify Petitioner</u>.

127.   Aliyah Charles clearly had no previous familiarity with Petitioner's face at all, but the "second chance" procedure gave rise to a predictable identification by Ms. Charles. Once again, Detective Martin was standing right next to Ms. Charles when she made her selection, this time of Petitioner, from the lineup.

128.   Through this illegal and unreliable procedure, police obtained from Ms. Charles an identification of Petitioner which they could not have obtained otherwise. Ms. Charles's lineup identification of Petitioner was a fabrication, an artifact of the police viewing procedures, the result of police misconduct and witness cueing and malleation. As the fruit of an illegal detention, it should have been suppressed. See, e.g., <u>United States v. Crews</u>, 445 U.S. 463 (1980); <u>Massillon v. Conway</u>, 574 F. Supp.2d 381, 395 (S.D.N.Y. 2008).

129.   Likewise, Aliyah Charles's subsequent in-court identification of Petitioner at his trial was also the fruit of that same illegal procedure and should not have been proffered at trial.

130.   Since Ms. Charles had provided no description of Petitioner, nor any basis for personal knowledge of Petitioner's participation in the crime before she engaged in these identification procedures, there was no independent source for her in-court identification. See <u>Crews</u>, <u>Massillon</u>, <u>supra</u>.


**Daymeon Smith and Freddy Patrice**

131.   As recited in ¶¶43–45, once police had obtained Aliyah Charles's fabricated lineup identification, the police then continued to hold Petitioner for two hours more, still in violation of the Fourth Amendment.

---

[81]  HT 320–23; 442–43 (Martin).

132.    The detectives did this in order to obtain two additional lineup identifications of Petitioner by two other individuals, members of the targeted victim group.

133.    Several hours after Ms. Charles left the precinct, the detectives brought Daymeon Smith and Freddy Patrice into the precinct to view a separate lineup, with Petitioner as the target.

134.    Neither Daymeon Smith nor Freddy Patrice had provided any description corresponding to Petitioner.  Freddy Patrice had given no basis for any personal knowledge of the perpetrators at all.

135.    The resulting lineup "recognitions" of Petitioner by Daymeon Smith and Freddy Patrice were the fruits of the illegal detention and the illegal lineup procedure involving Aliyah Charles, and should have been suppressed.

136.    Daymeon Smith's in-court identification of Petitioner at trial was also the fruit of those same illegal procedures.

137.    Since Daymeon Smith, prior to this lineup identification, had provided no description of Petitioner, nor any basis for personal knowledge of Petitioner's alleged participation in the crime, but only a description of a dark-skinned shooter in a blue winter hat, there was no independent source for his in-court identification.  See Crews, Massillon, supra.

138.    In addition, the People's use at trial of Freddy Patrice's alleged lineup "recognition" of Petitioner was also the fruit of those same illegal procedures (even if it occurred, which Mr. Patrice denied).[82]

**False police testimony at the suppression hearing to justify Petitioner's illegal arrest**

139.    Much confusion about these illegal procedures resulted from cagey, confusing, and demonstrably fraudulent testimony by the case detectives at the pretrial suppression hearing.

140.    As recited in ¶¶53–55, Detective Reedy testified at the pretrial suppression hearing that both Aliyah Charles and Daymeon Smith had identified Petitioner's photo out of the photospread; this was entirely false.[83]  When the prosecution finally acknowledged this falsehood, a crisis ensued,[84] leading the suppression court to adjourn to give Detective Reedy an opportunity to obtain counsel, and then again over an entire weekend.[85]  On Monday, June 12, 2006, Reedy retracted all of his prior testimony, and then testified that he had discussed his false

---

[82]  See Claim II below at ¶¶236–248.
[83]  HT 7–22; 83–85, 149 (Det. Reedy).
[84]  HT 167–72 (Det. Reedy).
[85]  HT 191–99; Ex. 14 (Alex Ginsberg, Bungler Cop Red in Face, N.Y. Post (June 12, 2006)).

testimony over the weekend with his fellow detectives, who had "refreshed his memory" about an "anonymous call" naming Petitioner as a perpetrator in the case.[86]

141.    This story about an anonymous call to the 67th Precinct was sheer invention, concocted over the weekend break to try to provide an illusion of probable cause.

142.    Reedy's testimony that Detective Martin had received the anonymous call[87] was demonstrably false, as shown by Detective Martin's subsequent testimony.

143.    Detective Martin's testimony, closely examined, reveals that he had not received the anonymous call, there was no DD5 about the anonymous call, he could not remember who had told him about it, did not know who had received it, and did not know exactly what the tip was.[88] But he brought up the anonymous call (sometimes referred to in the plural) again and again, whenever it seemed to be handy, indulging in blatant self-contradiction throughout his testimony.[89]

---

[86]  HT 213, 241 (Det. Reedy). Detective Reedy testified that the reason he hadn't remembered that the wrong Sheldon Thomas was in the photo array was that no DD5 had documented this fact. HT 187 (Det. Reedy).  His explanation for having testified that Daymeon Smith had identified Defendant out of the photo array was that he had confused the DD5 about Daymeon Smith's lineup identification with the DD5 about Aliyah Charles' photo identification.   HT 206 (Det. Reedy).

[87]  See HT 213–16 (Det. Reedy) (the officer who had received the anonymous call had "mentioned" it to Reedy over the weekend); HT 241–42 (Detective Martin had brought it up with him).

[88]  HT 376–79, 446–49 (Det. Martin). Detective Martin's testimony on this kept changing.  At first he claimed that there was one anonymous call, HT 290, 298, 347–49, 376–79, 446–49 (referring to a call in the singular), and later claimed that there were several anonymous calls, all of which had been received by other unknown officers, none of whom had documented these calls, but all of which basically "rehashed the same information." HT 465–66 (Martin) (making reference to anonymous calls in the plural); 473–74 (again making a reference to anonymous calls in the plural); HT 479–80 (claiming that there had been more than one anonymous call, and repeating that he had not received any of the calls, nor was there any documentation of them); HT 480 (claiming that the information in his spiral notebook is "from one call but the other calls combined basically rehashed the same information"). There was more blatant self-contradiction, as briefed in the CPL §440.10 motion.

[89]  For example, only a minute after testifying that he had heard the street name "Kern" from Aliyah Charles, Detective Martin testified that he had learned it from "the anonymous phone call to the 67 Detective Squad."  See HT 289–90 (he got it from Ms. Charles); HT 298 (he got it from the anonymous phone call).  And, after having testified that 67th Precinct detectives had informed him of Dalton Walters' address, nickname, and gang information, suddenly it turned out that he had gotten this detailed information from that useful anonymous phone call again, even though he had not actually received the anonymous call.  HT 297–98 (he got this information from 67th Precinct detectives); HT 377, 379 (he got it from the anonymous phone call).  And then suddenly Detective Martin testified that all the information on page 5 of his

144.    In addition to all this evidence of rank invention and falsehood, there is the obvious fact that, if there had been an anonymous call or calls to the precinct concerning Mr. Thomas as the perpetrator of a murder, it (or they) would have been documented and testified to by the officer (or officers) who received it (or them), but no other officer supported this story at all.[90]

145.    Even if the fictitious story about an anonymous call had been true, however, it could have provided no basis for putting Petitioner in a corporeal lineup.  A "call made from an unknown location by an unknown caller," Florida v. J.L., 529 U.S. 266, 270 (2000), in this case allegedly providing the names and addresses of Petitioner and other individuals as "possible" perpetrators,[91] or "in connection with"[92] a crime, did not even begin to meet the test for the alleged caller's reliability and basis of knowledge providing probable cause for arrest.  Id.

146.    The fictional anonymous call(s), however, formed part of the rationale for the state courts' denial of the suppression motion under the Fourth Amendment, as will be seen below.

A.  **The state courts' adjudications of this claim were both contrary to clearly established Federal law and based on unreasonable determinations of the facts.**

**The suppression court's decision**

147.    The suppression court denied Petitioner's Fourth Amendment claim in a single paragraph riddled with crucial factual and legal errors.[93]

148.    Probable cause to arrest Petitioner, the court said, was based on

information received from Kadeem Drummond and Confidential Witness #1 [Aliyah Charles], as well as verified information received from unknown callers, identifying [Petitioner] as one of the perpetrators.  Specifically, the police had information that one of the perpetrators was a young male black known as "Shelly," "Sheldon," "Loke" or "Smoke," and "Kurn" (phon.).  The police also had information from one unknown caller that one of the perpetrators, identified as "Sheldon," lived at 384 East 48th Street.  Utilizing computer checks by name, address and description, Detective Martin confirmed

---

notebook had come from the anonymous call, HT 447, when he had previously testified that it had come from Aliyah Charles.  HT 289–90.

[90]  Detectives Nash and Murphy provided no support for it.  HT 241–42 (Det. Reedy).

[91]  HT 289–90; 376–79; 446–47; 465–66; 473–74; 479–80 (Martin); Ex. 5 (Martin's notebook).

[92]  HT 348–49 (Martin).

[93]  Ex. 16 (dec'n and order of Justice Del Giudice, slip op., 07/13/06).  This decision pertained to the omnibus hearing held in regard to all three defendants in the case—Dalton Walters, Sheldon Thomas, and Ernesto Sergeant.  Petitioner's case is dealt with on pages 16–17 of the Judge's decision.

that defendant Thomas, known as "Smoke" and "Kurn" (phon.), indeed lived at the reported address.[94]

149.     This was factually inaccurate from beginning to end, and it was also in direct contravention of Federal law as clearly laid down by the United States Supreme Court.

150.     First, probable cause could not be based on information from Kadeem Drummond.  Mr. Drummond had not seen the perpetrators.  He neither identified Petitioner as "one of the perpetrators" nor even mentioned Petitioner as a "possible" perpetrator.[95]

151.     Second, probable cause could not be based on information from "Witness #1" (Aliyah Charles).  Ms. Charles had merely passed along to police the names of seven "possible" perpetrators, which she had heard from her friends.[96]  Detective Martin testified:

> Q  Now, the information you received from witness number one [Aliyah Charles], do you know where that information was gotten from by that witness?  Was that personal information or information that witness had heard going on?
> A  <u>It's what she heard going on in the street</u>.[97]

152.     And third, probable cause could not be based on information from "unknown callers" (even if they existed, which there is no reason to believe they did).  The only thing the alleged anonymous caller had said was that Petitioner—Sheldon Thomas of 384 East 48th Street—was a possible suspect in the crime.  Detective Martin testified:

> Q  …What information, if any, did you have that connected that Sheldon Thomas to the death of Anderson Bercy?
> A  It was the detailed information I had from the anonymous phone call giving the name of Sheldon.
> Q  In connection with the murder of Anderson Bercy?
> A  Yes…they gave the name Sheldon, Shelly, Loke, Smoky, the nicknames and exact address on East 48th Street.  That made the person sound credible.[98]

---

[94]  Ex. 16 (dec'n and order, Del Giudice, J., 07/13/06), slip op., at 16.

[95]  He named only "Yellow" as a possible suspect.  Ex. 2 (DD5 #17, dated 12/24/04) (interview of Kadeem Drummond).

[96]  HT 289–90 (Det. Martin).  Ms. Charles went to the 67th precinct to tell Detectives Martin and Reedy that her friends (members of the victim group) had told her "nicknames of the individuals that were possibly in the car"—Yellow, Smokey, Shelly/Sheldon Thomas, Kern, Has, O'Neil, and Chris. HT 289–90 (Det. Martin).  Detective Martin's notes also indicate that she told him "O'Neil" and "possibly Chris."  Ex. 5 (Det. Martin's spiral notebook); HT 426 (Det. Martin). (Ms. Charles is referred to throughout the suppression hearing as "confidential witness number one," and the documents and testimony establish "confidential witness number one" to be Aliyah Charles.)

[97]  HT 348–49 (Det. Martin).

[98]  HT 348–49 (Det. Martin).  As to the likelihood that the alleged anonymous call was invented over the weekend break, see above at ¶¶141–144.

Even according to Detective Martin himself, therefore, the anonymous phone call gave the same information that Aliyah Charles did.[99]  Petitioner was a "possible" suspect; had "possibly" been in the car.  No one provided any "verified information" "identifying" Petitioner as a perpetrator, i.e., no one gave any personal knowledge or observation of the crime, claiming to have seen Petitioner in the car.  For Fourth Amendment purposes, even if some unknown caller did provide police with Petitioner's nickname or address,[100] the mere fact that police "verified" that Petitioner had a particular nickname ("Shelly," "Loke")[101] or lived at a particular street address (384 East 48th Street), could not provide probable cause for arresting him.

153.    This was the exact holding of the Supreme Court in Florida v. J.L., 529 U.S. 266 (2000). In that case, an anonymous caller phoned police to say that a young black male in a plaid shirt standing at a bus stop was carrying a gun.  Id. at 268.  The tipster did not explain how he knew about the gun.  Id. at 271.  The police conducted a Terry stop and searched J.L. and found a gun on him.  The Court held that the gun must be suppressed because the police had no basis for believing "that the tipster ha[d] knowledge of concealed criminal activity," id. at 272, and there was therefore no reasonable suspicion for a Terry stop, id. at 270.

154.    The Supreme Court in J.L. specifically rejected the argument that reasonable suspicion for a Terry stop existed simply because the tipster's description of the individual proved accurate:

---

[99]  See, e.g., HT 480 (Det. Martin) (indicating that Aliyah Charles and the anonymous caller or callers had "basically rehashed the same information," i.e., by providing the names of Yellow, Has, Smokey, Shelly/Sheldon, Kern, Chris, O'Neill as "possible" perpetrators.

[100]  Detective Martin seemed to claimed that either Aliyah Charles, or an anonymous caller, or both, had given Petitioner's exact street address, 384 East 48th Street.  HT 447; HT 289–90. This was implausible on its face.  In addition, Petitioner's address was easily found by police because, not to his credit, he was already known in the 67th precinct.  Ex. 11 (affid. of Sheldon Thomas, dated 11/14/11), ¶¶5–15.  In fact, Detective Martin's notebook reflects that he obtained Petitioner's address from 67th precinct detectives.  Ex.5 (Det. Martin's spiral notebook).

[101]  Detectives Reedy and Martin repeatedly testified at the suppression hearing that "Smoke" or "Smokey" was Petitioner's nickname; that Petitioner himself had told the detectives that his nickname was Smoke, even though there was no documentation of Petitioner's having done so; and that Ms. Charles (and alleged anonymous sources) had attributed this nickname to Petitioner. See, e.g., HT 149, 170, 216 (Det. Reedy); HT 296, 452, 568, 593–94, (Det. Martin).  They even put this nickname on Petitioner's arrest report.  Ex. 10 (arrest photo, 12/18/04).  But it was, like so many of the things testified to in this case, untrue.  It turned out at trial that no one attributed this nickname to Petitioner, and that "Smokey" was someone else—an associate of Dalton Walters' named Jamal.  TT 603 (Daymeon Smith) (one of Yellow's known associates in the Outlaws gang is Jamal); TT 1384 (Kirk Lapaix) (Jamal's nickname is Smokey).   No witness in this case knew Petitioner as "Smokey" or knew him by any nickname.  (Review of entire trial transcript yields this negative result.)  See also Ex. 11 (affid. of Sheldon Thomas, dated 11/14/11), ¶¶17–18 (his nickname is Shelly or Shells; it is not Smoke or Smokey; and he told Detective Martin that).

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. Cf. 4 W. LaFave, Search and Seizure §  9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases.

Florida v. J.L., supra, at 269–72 (emphasis added).

155.    In Petitioner's case, the suppression court's decision about probable cause rested on an "unknown caller" and Aliyah Charles, both naming Petitioner Sheldon Thomas as a possible perpetrator, and allegedly knowing his name, nickname, and address.  Under J.L., this information, naming Petitioner and providing information to "correctly identify the person whom the tipster means to accuse," "in connection with" the crime, did not provide probable cause to arrest Petitioner and subject him to lineups, because it did not assert any personal knowledge of any such connection.

156.    The suppression court's decision was therefore in direct contravention of clearly established Federal law, as set down by the Supreme Court in Florida v. J.L.  All lineup identifications therefore were the fruits of Petitioner's illegal detention, and should have been suppressed.  See, e.g., United States v. Crews, 445 U.S. 463 (1980); Massillon v. Conway, 574 F. Supp.2d 381, 395 (S.D.N.Y. 2008).

157.    The suppression court then went on to hint that the issue before it was whether the apprehension team had relied in good faith on Aliyah Charles's selection of #5 in the photospread.  The court continued:

> Regarding the issue of probable cause to arrest defendant Thomas, it is of no legal consequence that the computer check had generated a photo of another individual named "Sheldon Thomas," that resembled defendant Thomas and that may have been relied upon in good faith by the apprehension team (see, e.g., People v. Fabian, 126 AD2d 664; see, also, People v. Wright, 100 AD2d 523, lv. Denied 62 NY2d 994).  In this connection, it is of note that although prior to defendant Thomas' arrest herein, Confidential Witness #1 [Aliyah Charles] had identified the photo of the other "Sheldon Thomas" in a photospread, Confidential Witness #1 added that she was "not 100% sure" and would have to see the individual in person "to be 100% sure".  Further, Sergeant Murphy testified that, prior to defendant Thomas' arrest herein, he had viewed a mug shot photo of defendant Thomas.[102]

158.    This was entirely misplaced, an incorrect framing of the issue before the court.

---

[102]  Ex. 16 (dec'n and order, Del Giudice, J., slip op., 07/13/06), at 16 (emphasis added).

159.    Granting the good faith of the <u>apprehension team</u>, first of all, resolves a non-issue.  The apprehension team did not even make a mistake.  They apprehended the person sought, pursuant to an "Investigation card" filled out by Detective Martin.

160.    The issue was whether Detective Martin had any probable cause, based on Aliyah Charles's statements to him (and alleged anonymous callers' statements), to have Petitioner arrested and brought to the precinct.

161.    But even granting a good-faith mistake on Detective Martin's part in having Petitioner arrested and brought to the precinct (which Petitioner does not concede; see ¶¶149–155), <u>once Detective Martin discovered that Petitioner was not the person selected by Aliyah Charles out of the photospread</u>, he could no longer claim to be relying on any arguable good-faith mistake when he failed to release Petitioner and instead held Petitioner in the precinct for lineups.

162.    As a matter of fact, Detective Martin never even claimed to have been relying on a good-faith mistake when he held Petitioner in the precinct for lineups after discovering his mistake.  He testified clearly that he knew that Aliyah Charles had selected the photo of an uninvolved individual, and he proceeded regardless.[103]  That was not even an arguable good-faith mistake.  There can be no doubt that, had Detective Martin applied to a judge for an arrest warrant under these circumstances, no judge would have issued it.

163.    In addition, the suppression court wrongly hinted that an asserted resemblance between Petitioner and #5 in the photospread could create probable cause <u>post hoc</u>:

> In this connection, it is of note that although prior to defendant Thomas'[s] arrest herein, Confidential Witness #1 [Aliyah Charles] had identified the photo of the other "Sheldon Thomas" in a photo array, Confidential Witness #1 added that she was "not 100% sure" and would have to see the individual in person "to be 100% sure."[104]

164.    As to the court's adoption of the prosecution's assertion of a resemblance between Petitioner and #5 in the photospread, that was a specious assertion, as can be seen by examining the photos,[105] and as will be shown below at ¶¶219–220.

165.    In addition, police cannot obtain an identification <u>post hoc</u> from a witness who provided no probable cause <u>ex ante</u>.  That is <u>exactly contrary</u> to the "fruit of the poisonous tree" doctrine.  A Fourth Amendment violation cannot be cured post hoc.  <u>See</u>, <u>e.g.</u>, <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963); <u>United States v. Crews</u>, <u>supra</u>, 445 U.S. at 472, 477.

166.    The use of illegally obtained evidence is especially noxious when the illegally obtained evidence is a fabricated identification—an identification of a person <u>which could not otherwise be obtained</u>, because the witness is not even familiar with the person's face.  See <u>Crews</u>, <u>supra</u>;

---

[103]  See generally, e.g., HT 322–358.
[104]  <u>Id</u>.
[105]  Compare Ex. 10 (Petitioner's arrest photo, 12/28/04), with Ex. 7 (photospread, 12/27/04).  Ms. Charles's selection is #5

and see generally, 4 LaFave, Search and Seizure § 11.4(g) (2d ed).  The police in this case held Petitioner in the precinct after realizing that he was not the person selected by Aliyah Charles from the photospread, and they held Petitioner for the specific purpose of obtaining from Aliyah Charles an identification that she would not and could not otherwise have made.

167.    In sum, Aliyah Charles provided police only with the names of individuals who were "possibly" in the murder car, which she gave, not from her own knowledge, but from guesses and speculation by her friends in the victim group.  She then proceeded to demonstrate her complete lack of familiarity with Petitioner by selecting the photo which the detective believed was a photo of Petitioner, but which was actually the photo of an entirely different person.  That photo selection was an artifact of the procedure used to obtain it, and the subsequent lineup identification of Petitioner by Aliyah Charles was also an artifact of the procedure used to obtain it.  The subsequent lineup identifications of Petitioner by Daymeon Smith (and Freddy Patrice, if one occurred) were likewise artifacts of the illegal procedures already used, and the fruits of a flagrant Fourth Amendment violation.

168.    Hence, all of the lineup identifications of Petitioner were products of clear illegality and should have been suppressed.  United States v. Crews, supra, 445 U.S. at 472, 477.

169.    As the result of such suppression, no in-court identifications could have been made without an independent-source hearing, at which all of the factors under United States v. Wade, 388 U.S. 218 (1967), would have been examined.  See Crews, supra; Massillon v. Conway, 574 F. Supp.2d 381, 395 (S.D.N.Y. 2008).  Since none of these witnesses had made any statement of personal knowledge, nor any descriptions of any perpetrators corresponding to Petitioner before these illegal identification procedures took place, there was no independent source for these identifications.

170.    The decision of the suppression court was based on unreasonable determinations of the facts and was also clearly contrary to Federal law as set down by the Supreme Court of the United States.  28 US.C. §2254(d)(1), (2).

**The Appellate Division decision**

171.    The Appellate Division, Second Department, upheld the suppression court's Fourth Amendment ruling, likewise committing numerous crucial factual and legal errors, stating in its entirety:

> The defendant alleges that there was no probable cause to arrest him, and that the resultant lineup identification evidence should have been suppressed. There was probable cause to arrest the defendant (see Spinelli v United States, 393 US 410; Aguilar v Texas, 378 US 108).  Contrary to the defendant's contention, the People adequately demonstrated that the citizen informant was reliable and had some basis of knowledge for the information given to the police (see People v Parris, 83 NY2d 342, 350; People v Robbins, 198 AD2d 451, 451).  The citizen informant came forward as a person who allegedly witnessed the shooting that formed the basis for the

26

prosecution of the defendant (id.).  Although the citizen informant identified another individual in a photo array as one of the perpetrators involved in the shooting, the person so identified had the same name as the defendant, looked like the defendant, and lived in the same general area as the defendant.  The "'arrest of a person who is mistakenly thought to be someone else is valid if the arresting officer (a) has probable cause to arrest the person sought, and (b) reasonably believed the person arrested was the person sought'" (People v Tejada, 270 AD2d 655, 657, quoting United States v Glover, 725 F2d 120, 122, cert denied 466 US 905; see Hill v California, 401 US 797, 802; Berson v City of New York, 122 AD2d 7, 8-9; Toenis v Hommel, 59 AD2d 1000).  Accordingly, the Supreme Court properly denied that branch of the defendant's motion which was to suppress the lineup identification evidence.

People v. Thomas, 65 A.D.3d 1170 (2d Dep't 2009).[106]

172.    This decision was contrary to the facts as well as contrary to clearly established Federal law. 28 US.C. §2254(d)(1), (2).

173.    First, the "citizen informant" (Aliyah Charles) had <u>not</u> "come forward" as a "person who allegedly witnessed the shooting," but rather as a person who was passing along to police seven names and nicknames of individuals who had "possibly" participated in the crime, names she had heard from her friends.[107]  So far as the record shows, Ms. Charles's claim to have witnessed the shooting developed only <u>after</u> she participated in identification procedures.  Again, the police testimony:

>    Q.  Now, the information you received from witness number one [Aliyah Charles], do you know where that information was gotten from by that witness?  Was that personal information or information that witness had heard going on?
>    A   <u>It's what she heard going on in the street.</u>[108]

174.    The Fourth Amendment violation cannot be cured post hoc by Aliyah Charles's subsequent claim to have witnessed the shooting.  That is in direct violation of all Fourth Amendment jurisprudence. <u>See</u>, <u>e.g.</u>, <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963); <u>United States v. Crews</u>, supra, 445 U.S. at 472, 477.

175.    Second, in regard to Ms. Charles's selection of an entirely irrelevant person, the appellate court (like the suppression court before it) decided a non-issue: the good faith of the apprehension team.  ("Although the citizen informant identified another individual in a photo array as one of the perpetrators involved in the shooting, the person so identified had the same name as the defendant, looked like the defendant, and lived in the same general area as the defendant.  The arrest of a person who is mistakenly thought to be someone else is valid if the

---

[106]  Ex. 17 (<u>People v. Thomas</u>, 2d Dep't, slip op., Sept. 15, 2009) (denial of direct appeal) (reported as 65 A.D.3d 1170).
[107]  Ms. Charles had told Detective Katranakis that she had heard shots, run to the window, and seen the car drive away. Ex. 3 (DD5 #14, dated 12/24/04) (Det. Katranakis).
[108]  HT 348–49 (Det. Martin).  (Emphasis added.)

arresting officer (a) has probable cause to arrest the person sought, and (b) reasonably believed the person arrested was the person sought." [109])

176.    As shown by the very cases the court cited,[110] where there <u>was</u> probable cause to arrest the person <u>actually</u> sought, but the police mistakenly arrested a <u>different</u> person because of a confusable resemblance between that person and the person sought, the combination of probable cause to arrest the original person sought, together with the good-faith mistake by the police, led to the conclusion in the cited cases, that the contraband or weapon found on the mistakenly arrested person need not be suppressed.

177.    But that was not the issue before the court.  Petitioner's case was <u>exactly the opposite</u> of the cited cases.  Petitioner <u>was</u> the person sought, but there was no probable cause to arrest him, based either on Aliyah Charles's naming of "possible" perpetrators whose names she had heard "in the street," or on her selection of a completely irrelevant person out of a photospread.  And, even if there was arguable probable cause to make the <u>initial</u> arrest, once Detective Martin discovered that Ms. Charles had not selected Petitioner's photo but rather the photo of an irrelevant person, there was no good-faith mistake.

178.    As already noted, Detective Martin had never even claimed that there was a good-faith mistake.  Detective Martin testified very clearly that during his interrogation of Petitioner he realized that Ms. Charles had selected a photo of a different person, and despite that, he failed to release Petitioner.  Instead, he held Petitioner for the specific purpose of displaying Petitioner to Ms. Charles in a lineup.[111]  There was simply no good-faith mistake at that point at all, and the appellate court's good-faith-mistake cases have no application to Petitioner's case.

179.    Finally, it was of no significance whatsoever (as the court seemed to believe) that #5 in the photospread had the same name as Petitioner.  The person's name was simply the explanation for how this person ended up in the photospread in the first place; he has no other connection to this case at all.  Detective Martin made a mistake in composing the photospread, pulling the wrong "Sheldon Thomas" out of a computer database.  If Detective Martin had mistakenly pulled out a "Richard Smith" or "William Harris" out of the database, believing it was Petitioner Sheldon Thomas, the result would have been the same.  The point is that, when Aliyah Charles selected the photo, #5 in the photospread, she was selecting the photo of the person <u>Detective Martin</u> believed was the target of the photospread, whatever his name was.  This was administrator cueing, pure and simple.

180.    In addition, the court's asserted resemblance between Petitioner and #5 in the photospread was completely specious, as shown below at ¶¶219–220.

---

[109]  Ex. 17 (<u>People v. Thomas</u>, 2d Dep't, slip op., Sept. 15, 2009) (denial of direct appeal) (reported as 65 A.D.3d 1170).

[110]  See <u>id.</u> at 17, citing <u>People v. Tejada</u>, 270 A.D.2d 655, 657, quoting <u>United States v. Glover</u>, 725 F2d 120, 122, cert. denied, 466 U.S. 905; see <u>Hill v. California</u>, 401 U.S. 797, 802; <u>Berson v. City of New York</u>, 122 A.D.2d 7, 8–9; <u>Toenis v. Hommel</u>, 59 A.D.2d 1000).

[111]  See generally, e.g., HT 322–358.

181.    In sum, there was no basis to find that there was probable cause to arrest, under the law set out in Florida v. J.L., 529 U.S. 266, 270 (2000), or to detain Petitioner in the precinct after the error was discovered (under the good-faith-mistake cases cited by the court or otherwise), and the lineup identifications obtained as a result of the illegal detention should have been suppressed.  United States v. Crews, 445 U.S. 463 (1980); Wong Sun v. United States, 371 U.S. 471, 488 (1963).

182.    As the result of such suppression, no in-court identifications could have been made without an independent-source hearing, at which all of the factors under Neil v. Biggers, 409 U.S. 188, 198 (1972) would have been examined.  Since none of these witnesses had made any statement of personal knowledge, nor any descriptions of any perpetrators corresponding to Petitioner before these illegal identification procedures took place, there was no independent source.

183.    For these reasons and for the same reasons given above at ¶¶147–170 in regard to the suppression court's ruling, the Appellate Division's decision was contrary to the facts and contrary to Federal law, and Petitioner is entitled to habeas corpus relief.  28 US.C. §2254(d)(1), (2).


**II.  PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT, AND THE STATE COURTS' ADJUDICATIONS WERE CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW AND WERE BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.  U.S. CONST. AMENDS. VI, XIV.  28 US.C. §2254(d)(1), (2).**

184.    Counsel's performance fell so far below any reasonable professional standard as to constitute ineffective assistance as a matter of law under Strickland v. Washington, 466 U.S. 668 (1984).

185.    Before trial, defense counsel failed to take elementary measures to prevent the admission of fabricated and unconstitutionally tainted identification testimony, or to preserve due process identification issues for appellate review.  During trial, among other errors, defense counsel elicited damaging, unreliable, and otherwise inadmissible evidence, including an additional, unreliable, and repudiated out-of-court identification.  Trial counsel not only was of no use to his client; he did him active harm.  Petitioner had a better chance of an acquittal with no counsel at all.  Counsel contributed to the prosecution's case, ensured Petitioner's conviction, and deprived Petitioner of the opportunity to appeal his conviction on viable due process issues surrounding the false identifications.  The inexcusable act of eliciting at trial an additional unreliable identification alone would require the setting aside of this conviction.

186.    All of these claims have been exhausted, including the claim that trial counsel failed to preserve the due process identification issues for appellate and federal review, as required by

Edwards v. Carpenter, 529 U. S. 446 (2000).[112]  The state courts' adjudications of these claims were based on unreasonable determinations of the facts and contrary to clearly established Federal law.  28 US.C. §2254(d)(1), (2).

### A. Counsel, confused, unprepared, and incoherent, incompetently litigated the Fourth Amendment issue.

187.    In Claim I, above, Petitioner alleges that the state courts' adjudications of the Fourth Amendment claim were contrary to the facts and contrary to law, and that on that basis Petitioner is entitled to relief under 28 US.C. §2254(d)(1), (2).  In addition, and in the alternative, trial counsel, confused, unprepared, and incoherent before, during, and after the suppression hearing,[113] litigated the probable cause issue incompetently, which contributed to the failures of the state courts to arrive at a correct decision.

188.    At the suppression hearing, trial counsel's insistence that #5 in the photospread was a reasonable suspect in this crime turned the hearing into a risible inquiry about whether Petitioner was the person named in Aliyah Charles's street tips, which he obviously was.

189.    The notion that #5 in the photospread had anything to do with the crime had no basis whatsoever, and it merely invited the prosecution to claim that Petitioner resembled the person Ms. Charles selected from the photospread.

190.    There is no confusable resemblance between Petitioner and #5 in the photospread. Such claim is not only untenable on its face, to anyone with eyes to compare the arrest photo of Petitioner Thomas with photo #5 in the photospread.[114]  This supposed resemblance was a specious explanation concocted to explain Aliyah Charles's selection of #5 in the photospread, and (illogically) to justify the Fourth Amendment violation.

191.    Trial counsel, however, did nothing to dispute the prosecution's theory of a resemblance between #5 in the photo array and Petitioner.  The result of this failure was that the suppression court adopted the prosecution's theory, and the spurious assertion of a resemblance became engraved in the appellate record as part of a clearly incorrect finding of probable cause under good-faith-mistake cases.[115]

---

[112]  See Ex. 25 (decn. and order of Del Giudice, J., 06/05/12), slip op. at 5–10 (ruling that all due-process claims surrounding the identifications were barred under CPL §440.10(2)(a) or (c) or (3)(a), and rejecting the claim of ineffective assistance of counsel entirely on the merits, including the claim that counsel failed to preserve the due-process identification and other due-process issues); and Ex. 26 (People v. Thomas, N.Y. Slip Op. 06526 (2d Dep't, Aug.12, 2015)) (affirming that Petitioner's due process claims were procedurally barred.

[113]  See, e.g., HT 162–63, 799, 802–07.

[114]  Compare Ex. 10 (Petitioner's arrest photo, 12/28/04) with photo #5 in the photospread, Ex. 7 (photospread, 12/27/04).

[115]  Ex. 16 (dec'n and order, Del Giudice, J., 07/13/06), at 16; Ex. 17 (People v. Thomas, 2d Dep't, slip op., Sept. 15, 2009) (denial of direct appeal) (reported as 65 A.D.3d 1170).

192.    Post-conviction counsel submitted on the CPL §440.10 motion a double-blind study conducted by Professor Brian Sheppard, whose dramatic results establish to a near-certainty that anyone familiar with Petitioner Sheldon Thomas's face, even from a photograph observed for a very short period, would not select <u>any</u> of the photographs in the photospread as being Petitioner, and, furthermore, that the photo in the photospread bearing the greatest resemblance to Petitioner, by a very, very wide margin, is not #5, but #2.[116]   The Sheppard study provided powerful statistical corroboration for the claim that Aliyah Charles's choice of #5 in the photospread was not the result of a "remarkable" or even confusable similarity, but rather the result of police cueing.

193.    But even more importantly, for Fourth Amendment purposes, the issue was whether Aliyah Charles had any personal knowledge, or had conveyed anyone else's personal knowledge, or whether the alleged anonymous caller(s) had conveyed any personal knowledge, of Petitioner's (or anyone else's) involvement in this crime.  It was clear that no one had.  Again, Detective Martin:

> Now, the information you received from witness number one [Aliyah Charles], do you know where that information was gotten from by that witness?  Was that personal information or information that witness had heard going on?
> A   <u>It's what she heard going on in the street.</u>
>
> Q   …What information, if any, did you have that connected that Sheldon Thomas to the death of Anderson Bercy?
> A   It was the detailed information I had from the anonymous phone call giving the name of Sheldon.
> Q   In connection with the murder of Anderson Bercy?
> A   Yes…they gave the name Sheldon, Shelly, Loke, Smoky, the nicknames and exact address on East 48th Street.  That made the person sound credible.[117]

194.    As shown above in Claim I, none of this information, which identified Petitioner as a determinate individual in the neighborhood, but claimed no personal knowledge of his involvement in a crime, could give rise to probable cause for putting Petitioner in a lineup, under <u>Florida v. J.L.</u>, 529 U.S. 266, 270 (2000).

195.    New York courts had acknowledged the law set out in <u>Florida v. J.L.</u> at least as far back as 2001.  See <u>People v. Ballard</u>, 279 A.D.2d 529, 530 (2d Dep't 2001).  See also <u>People v. Kennedy</u>, 282 A.D.2d 759, 760 (2nd Dep't 2001) (suppressing the two lineup identifications as the fruit of an illegal arrest, and remanding for a new trial preceded by an independent source hearing, under <u>People v. Dodt</u>, 61 N.Y.2d 408 (1984), because the arrest had been based on information from an anonymous caller who gave no personal knowledge of the shooting).

---

[116]   Ex. 21 (Sheppard study).
[117]   HT 348–49 (Det. Martin).  As to the high likelihood that the alleged anonymous call was invented over the weekend break, see above at ¶¶141–144.

196.    Hence, in 2006, there was no reason for trial counsel not to know the law under J.L., Ballard, and Kennedy, supra, and not to marshal the facts and make the appropriate arguments under those and other cases.  But counsel showed no mastery of the facts or the law.  He failed to challenge the existence of the phantom anonymous call or calls (allegedly received by some unknown officer or officers, but never documented); and failed to show that even if there was such a call or calls, they provided no basis for probable cause because they made no claim of personal knowledge of Petitioner's involvement in the crime.

197.    When the suppression court handed down its written decision on the Fourth Amendment claim,[118] it reflected a misapprehension of the actual facts that had emerged from the hearing, as well as an incorrect framing of the legal issues at hand.  The suppression court's errors are shown above in Claim I, at ¶¶147–170.

198.    But trial counsel did nothing—apparently because he did not know the facts himself, as is corroborated by the fact that he filed no motion for reconsideration nor made any effort to clear up the facts by reference to the hearing transcript, and as is also shown by his inexplicable statement to the court at sentencing that the pretrial decision was "obviously a very thought out decision."[119]  In fact, counsel never evinced any awareness of what the actual facts of this case were.

199.    Counsel's failures resulted not only in the loss of the motion but also in a chaotic record for appellate purposes.  Despite appellate counsel's efforts on the appeal, the Appellate Division, Second Department, upheld the suppression court's clearly incorrect ruling.[120]  If trial counsel had litigated this competently, by coherently marshaling the facts and the law applicable to them, the trial court could not have made these mistakes, or at least these mistakes could not have been upheld on appeal.  See Massillon, supra, 574 F. Supp.2d at 406 (if counsel had litigated the Fourth Amendment issue competently, there was a reasonable probability that the identifications would have been suppressed by a New York court, either at the trial level or on appeal).

**B.  Counsel failed to move to exclude fabricated and unconstitutionally tainted identification testimony on due process grounds, and as a result of that failure, the People presented evidence at trial of two unreliable and false identifications, which formed the only basis for the conviction; additionally, as a result of that failure,**

---

[118]  See Ex. 16 (dec'n and order of Justice Del Giudice, 07/13/06).
[119]  Ex. 28 (sentencing tr.), at 7.
[120]  See Ex. 17 (People v. Thomas, 2d Dep't, slip op., Sept. 15, 2009) (denial of direct appeal) (reported as 65 A.D.3d 1170).  The errors in this decision are discussed in Claim I, ¶¶171–183.

**counsel also failed to preserve the due process identification claims for appellate and federal review.**

200.    This was a homicide case in which patently unsound identifications were the only evidence.  Any competent defense lawyer would have seen how rife with error the entire identification process was, and how false and unreliable the identifications were.  Petitioner's trial counsel should have challenged their admissibility on due process grounds of suggestiveness and unreliability, under the Due Process Clauses of the State and Federal Constitutions.  See, e.g., United States v. Wade, 388 U.S. 218 (1967); Stovall v. Denno, 388 U.S. 293 (1967); People v. Adams, 53 N.Y.2d 241, 251 (1981); Manson v. Brathwaite, 432 U.S. 98, 114 (1977), and their progeny.  Counsel failed to do so, however, and, as a result of this failure, counsel not only failed to obtain the exclusion of any of the prosecution's proffered identifications on due process grounds; he also failed to preserve any of the due process claims for appellate and federal review.

201.    The entire investigation had rested on the victim group's guesses and speculation, as communicated through "witness #1" (Aliyah Charles). Before she began to engage in identification procedures, Ms. Charles never gave any hint of personal knowledge nor any description of the perpetrator she later claimed was Petitioner, but rather only names and nicknames she heard from her friends; during all six of the identification procedures she participated in, she had clearly been following police cues (whether conscious or inadvertent). Her identification testimony should have been suppressed on the due process grounds that she was not familiar with Petitioner's face at all, and that she therefore had no testimonial qualifications to identify him.

202.    Daymeon Smith's identification was the result of similarly, albeit not as dramatically, tainted procedures, and should similarly have been suppressed.

203.    But trial counsel failed to move to suppress any identification on due process grounds.

204.    Identification issues were well known to competent criminal defense attorneys by the time of counsel's 2005 appointment in this case.  The dangers of non-blind identification procedures and confirmatory feedback effects had been widely spoken of in the popular press for many years.[121]  By 2000, the research demonstrating the dangers of non-blind administration of identification procedures was so robust and well known that blind administration was required by guidelines promulgated by the Department of Justice and the New Jersey Attorney General's

---

[121]  Attached hereto is Exhibit 29, a copy of the Index to the appendix of articles about identification issues submitted to the CPL §440.10 court and made part of the record.  Copies of these articles will be supplied to the Court on request.  See, e.g., Ex. B-32 (Gina Kolata & Iver Peterson, New Jersey Is Trying New Way for Witnesses to Say, 'It's Him,' N.Y. Times, July 21, 2001, A1)); Ex. B-63 (Shaila K. Dewan, Lawyer Urges Change in Conduct of Lineups, N.Y. Times (June 28, 2001) (efforts of Bronx public defender David Feige to change the way lineups are done)); B-33 (Daniel Goleman, Studies Point to Flaws in Lineups of Suspects, N.Y. Times, Jan. 17, 1995) (citing the work of Gary L. Wells and others)).  These articles were all made part of the CPL §440.10 record, and are incorporated by reference.

Office.[122]  In 2002, it was reported in the <u>New York Law Journal</u> that District Attorney Hynes had made non-blind identification procedures a policy in his office.[123]  Several New York cases in which a trial judge had ordered that lineups be done blind had been reported.[124]

205.   <u>Champion</u> magazine, published by the National Association of Criminal Defense Lawyers, had published articles providing resources on eyewitness issues since the 1990's.[125]  A couple of months before counsel's assignment in Petitioner's case, <u>Champion</u> published a thorough and updated guide to identification issues, citing some of the most important literature available and providing specific guidance on challenging identifications not obtained through blind procedures.[126]  In April 2005, only a couple of months after counsel's appointment in this case, <u>Champion</u> published an article by Gary L. Wells,[127] the leading identification researcher on whose expertise the DAO had relied in implementing blind identification procedures in 2002.

206.   Yet even with all this guidance available, in the face of the evidence of suggestiveness and unreliability brought out at the suppression hearing, counsel failed to challenge the admissibility of the identifications on due process grounds.

207.   At the very least, Aliyah Charles's identification should have been suppressed, and there should have been an independent source hearing as to Daymeon Smith.  But instead Aliyah Charles was peddled to the jury as an actual identifying witness, and Daymeon Smith likewise identified Petitioner, despite all the signs of witness malleation and unreliability.

**Aliyah Charles**

---

[122]  Ex. B-3, Technical Working Group for Eyewitness Evidence, United States Department of Justice, <u>Eyewitness Evidence:  A Guide for Law Enforcement</u> (1999); Ex. B-27 (New Jersey Attorney General, <u>Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures</u> (Apr. 18, 2001).

[123]  Ex. 30 (Hynes Endorses Double-Blind Police Lineups, 228 N.Y.L.J. 9 (Dec. 13, 2002)). (submitted to the CPL §440.10 court as B-26).

[124]  E.g., <u>People v. Kirby</u>, 6 Misc.3d 1012(A), (Kings Cty.2002); <u>In re People v. Wilson</u>, 191 Misc.2d 224 (Kings Cty.2002); <u>In re Rahim Thomas</u>, 189 Misc.2d 487 (Kings Cty.2001).

[125]  Ex.B-71 (James M. Doyle, <u>Two Stories of Eyewitness Error</u>, CHAMPION 24 (Nov. 2003)) Ex.B-70 (James M. Doyle, <u>No Confidence: A Step Toward Accuracy in Eyewitness Trials</u>, CHAMPION (Jan./Feb. 1998)).

[126]  Ex. 31 (Lisa Steele, <u>Trying Identification Cases: An Outline for Raising Eyewitness ID Issues</u>, CHAMPION 8 (Nov. 2004) (citing numerous materials, including, e.g., Ex.B-3 (DOJ Guidelines), Ex.B-27 (New Jersey Attorney General's guidelines), Ex.B-66 (Bill Nettles et al., Eyewitness Identification: "I Noticed You Paused at Number Three," CHAMPION 11 (Nov. 1996). A copy of the Steele article was submitted to the CPL §440.10 as Ex.B-64).

[127]  Ex.B-28 (Gary L. Wells, <u>Eyewitness Identification Evidence: Science and Reform</u>, CHAMPION, Apr. 29, 2005), at 12, 18.  Conscientious criminal defense lawyers, of course, would have consulted updated standard treatises on the subject, such as Sobel, EYEWITNESS IDENTIFICATION.

208.    Diligent research has disclosed <u>not one other case</u> in the United States in which a witness such as Aliyah Charles has been permitted to identify a defendant at trial.  Ms. Charles's identification testimony should have been excluded on the due-process grounds that she was not familiar with Petitioner's face at all, from the crime scene or otherwise, and that her lineup and in-court identifications were fabrications resulting from administrator cueing.[128]

209.    There is no reasonable explanation for Ms. Charles's selections of two different individuals as the same individual, except for administrator cueing.  The facts show that she simply was not familiar with Petitioner's face at all and was following police cues, conscious or unconscious.  Trial counsel entirely failed to attempt to argue this.

210.    Prodigious research undertaken in response to the Supreme Court's decisions in <u>Manson</u>, <u>supra</u>, <u>Neil v. Biggers</u>, 409 U.S. 188, 198 (1972), and their progeny, has resulted in an unusually robust body of research conclusively demonstrating that lineup administrators who know where the suspect is in the photo array or lineup can leak that information to the witness, consciously or unconsciously; that seemingly innocuous words and subtle cues (such as pauses, gestures, hesitations, or smiles) can influence a witness's memory, confidence level, and behavior; and that interaction between the investigator and the witness before, during, and after the identification procedure can have deep and lasting biasing effects on the witness, raising the risk of misidentification and conviction of the innocent.

211.    The literature is vast.  A sampling of the most cited literature was provided to the CPL §440.10 court, but was ignored.  Attached hereto (as noted above) is Exhibit 29, a copy of the Index to the appendix of articles submitted to the CPL §440.10 court.  Many of these articles are easily available online, and copies will be of course supplied to the Court on request.  Much of the literature is summarized and described in Gary L. Wells, <u>Eyewitness Identification: Systemic Reforms</u>, 2006 WIS. L.REV. 615).[129]  And see also National Research Council of the National Academies, <u>Identifying the Culprit: Assessing Eyewitness Identification</u> (2014), available at <u>http://www.nap.edu</u>.

212.    A photospread or lineup tests a witness's ability to identify the person he or she has <u>described</u> as a perpetrator.[130]  It generally consists of a "target" (a person suspected of being that person) in a group of five or more known innocent persons, known as "fillers" or "foils."  In some laboratory experiments, there is no "target" present, and the lineup contains only fillers.[131]

213.    Unbeknownst to Detective Martin, that was functionally the case with the photospread he showed to Aliyah Charles.  Unintentionally, his photospread contained six "fillers," i.e., six known innocent individuals—the five <u>intended</u> fillers, plus one <u>inadvertent</u> filler.  When

---

[128]  The facts supporting these assertions are supplied supra at ¶¶19–51; 120–130; Ex. 13 (witness chart and timeline with citations to record references).
[129]  Submitted to the CPL §440.10 court as Ex. B-7.
[130]  See, e.g., B-62 (Wells et al., <u>The Selection of Distractors for Eyewitness Lineups</u>, 79(5) J. Applied Psychol. 835 (1993)).
[131]  <u>Id</u>.

Detective Martin showed Aliyah Charles the photospread, he still mistakenly believed that the photo in the #5 spot was the target of the investigation, but really #5 was an inadvertent "filler."

214.    When a witness selects a filler as the person she claims to be able to identify, she demonstrates her lack of qualification to identify that person,[132] and in this case, Ms. Charles, with Detective Martin standing right next to her, selected the photo of the person whom Detective Martin mistakenly believed to be the target of the photospread.

215.    The police then set up a lineup to deliberately to obtain from Ms. Charles an identification that was an artifact of the very procedure, a result of administrator cueing.

216.    Trial counsel was completely unprepared and unequal to the task of challenging the constitutionality of the identifications on due process grounds.  Taken by surprise at the suppression hearing,[133] he failed to make any showing at all that Aliyah Charles was not qualified to identify Petitioner.  Instead, he raised up a fog of suspicion in an attempt to persuade the suppression court that the true target of the investigation was actually #5 in the photospread.

217.    That was contrary to common sense and contrary to the facts.  There was no reason to believe that #5 in the photospread had anything to do with this case at all, and this suggestion obscured what really happened here, that Aliyah Charles had no idea what Petitioner looked like, and that her lineup identification of Petitioner had been fabricated through police cueing and malleation.

218.    It also led to the prosecution's outlandish assertion that Ms. Charles's selection of #5 was not a "misidentification" because #5 in the photospread "looks remarkably similar" to Petitioner,[134] which was peddled to the jury.[135]

219.    As already alleged above, trial counsel did nothing to try to dispel the notion that there was a confusable resemblance between #5 in the photo array and Petitioner, as a result of which the suppression court adopted this notion.  This specious explanation for Aliyah Charles's selection of #5 in the photospread, invented by the prosecution on the spur of the moment to illogically justify the Fourth Amendment violation, became engraved into the appellate record in this case.[136]

---

[132]  Ex.B-60 (Wells & Turtle, Eyewitness Identification: The Importance of Lineup Models, 99 Psychol.  Bull. 320, 321 (1986)).

[133]  See Ex. 14 (Alex Ginsberg, Bungler Cop Red in Face, N.Y. Post, June 12, 2006) (quoting Mr. Chaikin as saying: "When I looked at [the photo array], my eyes opened…I said, 'Whoa,' and I turned to my client and said, 'Would you tell me which one of these people is you?' and he said, 'None' "); Ex. 11 (affid. of Sheldon Thomas, dated 11/14/11), ¶¶ 17, 27–28; HT 322–23, 442–43 (Det. Martin); Ex. 24 (Chaikin affirm. 03/23/12), at 3.

[134]  Ex. 15 (affirm. of ADA Rodriguez, 6/29/06).

[135]  TT 1850 (ADA Bennett in closing to the jury):  "[T]hey have similar noses.  They have similar eyebrow structure, the bone under there.  They have similar faces and similar lips."

[136]  Ex. 16 (dec'n and order, Del Giudice, J., 07/13/06), at 16. (Emphasis added.)

220.    The Sheppard report, submitted on the CPL §440.10 motion, establishes to a near-certainty that anyone familiar with Petitioner Sheldon Thomas's face, even from a photograph observed for a very short period, would not select <u>any</u> of the photographs in the photospread as being Petitioner, and that the photo in the photospread bearing the greatest resemblance to Petitioner, by a very, very wide margin, is not #5, but #2.[137]  The Sheppard study provides powerful statistical corroboration for the claim that Aliyah Charles's choice of #5 in the photospread was not the result of a "remarkable" or even confusable similarity, but rather the result of police cueing.

221.    The CPL §440.10 court held that the Sheppard study was not "newly discovered evidence" under New York law, because it was only "newly created" for the CPL §440.10 motion, and therefore could not meet the requirement that such evidence be "such as could not have been discovered before trial by the exercise of due diligence."[138]

222.    Under that ruling, it logically follows that something similar to the Sheppard study could have been generated in time for trial, i.e., counsel could have done something similarly effective to expose as fallacious the People's assertion of a confusable resemblance between #5 in the photospread and Petitioner.

223.    Counsel, however, did nothing to try to show either the pretrial court or the jury that Aliyah Charles's identification of both individuals as the same individual could not be explained by a confusable similarity.  Taking New York courts' ruling at face value, it a fortiori establishes that the failure to generate a study similar to the Sheppard study prior to trial was an act of ineffective assistance of counsel.  There is no "no man's land" category where important new evidence is not "newly discovered" because it could have been generated before trial, but yet failure to generate it before trial was not an act of ineffective assistance.

224.    Trial counsel's failure in this regard was part and parcel of counsel's global failure to challenge the admissibility of Aliyah Charles's identifications (lineup and in-court) on the grounds that she had demonstrated herself to be not a percipient witness qualified to identify Petitioner at all, and that her identifications of Petitioner were mere artifacts of the police procedures used, i.e., fabrications resulting from witness cueing and malleation.

**Daymeon Smith and Freddy Patrice**

225.    Many issues of suggestiveness, witness fabrication, police-invited witness-to-witness contamination, and other police misconduct arose during the pretrial suppression hearing in regard to the procedures leading to the "recognition" of Petitioner by Daymeon Smith and the alleged "recognition" of Petitioner by Freddy Patrice, which should have prompted counsel to move to suppress all of the identifications on due process grounds and should have given rise to an expanded <u>Wade</u> hearing and an independent-source hearing.  By failing to raise any of these

---

[137] Ex. 21 (Sheppard study).
[138] Ex. 25 (dec'n and order of Del Giudice, J., 06/05/12) (denying CPL §440.10 motion), slip op. at 11–12.

due process issues, counsel deprived Petitioner of the opportunity to explore independent-source issues under Neil v. Biggers, 409 U.S. 188, 198 (1972) (e.g., the fact that no one had described Petitioner before engaging in identification procedures, as well as lighting, stress, duration, weapon focus, post-event information, and witness-to-witness contamination) at a pretrial hearing—and also failed to preserve these crucial issues of due process violations for review in State and Federal court.[139]

226.    Counsel's failure to preserve these issues meant that they were unpreserved for appellate review under CPL §440.10(2)(a), (2)(c), or (3)(a).[140]  This is prima facie ineffective assistance. It is well settled that "[e]ffective trial counsel preserves claims to be considered on appeal and in federal habeas proceedings," Martinez v. Ryan, 132 S.Ct. 1309, 1317 (2012) (citations omitted).

227.    Counsel made other errors to Petitioner's detriment at the suppression hearing, which were detailed in the CPL §440.10 motion and supported by Petitioner's affidavit, for example, cross-examining the wrong officer about prior encounters with Petitioner, encounters that were relevant to issues of police influence on and contamination of witnesses.[141]

### C.   At trial, counsel elicited damaging, prejudicial, otherwise inadmissible, and unreliable evidence against his own client.

228.    There can be no clearer duty of defense counsel than to refrain from strengthening the prosecution's case at trial by introducing, eliciting, or opening the door to prejudicial information that the prosecution is precluded from introducing on its case in chief.  But counsel in this case did, over and over again, introduced, elicited, and opened the door to damaging, unreliable, and otherwise inadmissible information, including an additional, unreliable and repudiated, identification of Petitioner.

229.    The first eyewitness proffered by the prosecution at trial was Daymeon Smith, who testified that when the drive-by car drove up beside him and the other victims, he saw a shooter

---

[139]   As sketched out above in ¶53, before trial Mr. Chaikin explicitly raised, and the suppression court explicitly rejected, only one claim, that Petitioner's arrest was without probable cause under the Fourth Amendment.

[140]   See Ex. 25 (decn. and order of Del Giudice, J., 06/05/12) (denying CPL §440.10 motion), slip op. at 5–10 (ruling that all due-process claims surrounding the identifications were barred under CPL §440.10(2)(c) or (3)(a), and Ex. 26 (People v. Thomas, N.Y. Slip Op. 06526 (2d Dep't, Aug.12, 2015) (affirming that Petitioner's due process claims were barred under CPL §440.10(2)(a) or (2)(c)).

[141]   Ex. 11 (affid. of Petitioner Sheldon Thomas, 11/14/11), ¶¶7–15.  In Mr. Chaikin's response to the CPL §440.10 motion, he said he did not remember why he cross-examined Sgt. Murphy about this, but speculated that it must have been based on what Petitioner or his family had told him.  Ex. 24 (Chaikin affirm., 03/23/12), at 5.  That is highly unlikely, to say the least.  Both Mr. Thomas and his grandmother, Lurline Coke, submitted affidavits about this in support of the CPL §440.10 motion.  Ex. 11 (affid. of Petitioner Sheldon Thomas, 11/14/11), ¶¶7–15; Ex. 22 (affid. of Lurline Coke, 11/8/11); see also Ex. 23 (affid. of Pauline Williams, dated 11/18/11).

in the front passenger seat roll the window down and thrust a gun out; Mr. Smith had immediately run in the opposite direction as the car rolled away and shots were fired.[142]  Mr. Smith identified Petitioner at trial as the shooter he had seen thrusting a gun out the front passenger seat, wearing a winter hat with ear flaps,[143] a person whom he had described to police as "dark-skinned."  Mr. Smith admitted on cross that, by his own standards, Petitioner was not "dark-skinned."[144]

230.    Aliyah Charles identified Petitioner as an entirely different individual.  She identified Petitioner as having been seated in the driver's seat, hatless.[145]

231.    Also in direct contradiction of Daymeon Smith's testimony, Ms. Charles identified the shooter in the front passenger seat as co-defendant Dalton Walters; she also testified that the shooter in the rear passenger seat was Ernesto Sergeant ("Kern"),[146] who had been dismissed from the case (but the jury never knew that).

232.    Ms. Charles had dramatically adjusted her story to lend false credence to her ability to have clearly seen four faces inside the car, when she had been sitting at a second-floor window watching TV,[147] with lights on inside the apartment but nighttime outside.[148]

233.    That was it.  That was the prosecution's case against Petitioner—two problematic witnesses, identifying Petitioner as two different individuals (one identifying Petitioner as a hatless driver and the other identifying him as a hatted shooter in the front passenger seat)—rendering at least one of the identifications, of logical necessity, wrong.

234.    But instead of attempting to demonstrate the unreliability of both of these identifications, trial counsel ended up eliciting an additional, otherwise inadmissible, identification and other unreliable and untrue testimony, all of which disastrously bolstered the prosecution's case.

---

[142]  TT 667–73.

[143]  TT 800.

[144]  TT 802.

[145]  TT 1138.

[146]  See, e.g., TT 937–43, 1130.

[147]  TT 936, 939 (Aliyah Charles).

[148]  Mr. Walters's counsel, Lawrence Wright, cross-examined Ms. Charles as to how she could have seen anyone fire on the victims from the passenger side of the car from her vantage point—the second-story window across the street, facing the driver's side, on a dark cold night, through the car's rolled-up tinted windows.  Ms. Charles's account of this was so obviously contrived and unlikely as to be incredible almost as a matter of law.  She claimed that she had spent twenty minutes scrutinizing the people in the car as it sat in a parking space, TT 1096-97, when this was a drive-by shooting, as established by the other evidence, including police crime-scene diagrams showing a different car in that parking space, TT 845-51 (Det. Mulvanerty); that the apartment window was wide open, although it was a cold night, because it was hot in Lapaix's room, TT 986; that the car windows were only lightly tinted, id.; and that the car's interior lights had been on, TT1096.  (Mr. Smith had more credibly testified that the inside of the car was dark.  TT 728.)

235.    This began with counsel's attempt to propose, as an alternate suspect, the other Sheldon Thomas (the undisputedly innocent filler selected by Aliyah Charles from the photospread).[149] But there had never been any basis for even suspecting <u>that</u> Sheldon Thomas, whose photo had been placed in a photospread mistakenly.  Trial counsel had already elicited from both Daymeon Smith and Kirk Lapaix that they did not recognize #5 from the photospread.[150]  And Kadeem Drummond, the surviving victim who was shot in the shoulder, had testified that he had known Petitioner from the neighborhood for several years, that they had worked together cleaning houses for sale, and that he knew Petitioner lived on 48th Street; "People used to tell me he was Crip, but I wasn't too sure."[151]  Thus, for anyone who knew Petitioner from the neighborhood, "Sheldon Thomas" meant only one person: Petitioner.

236.    But defense counsel, despite all this, persisted.  He called Detective Martin to testify, to challenge him to explain why he had failed to investigate the other Sheldon Thomas, #5 from the photospread.  Detective Martin testified that he had no reason to do so, since that person was not from East Flatbush; he lived closer to Brownsville.[152]

237.    At that point, the prosecutor warned defense counsel at sidebar that if he continued to challenge Detective Martin on the reasons why he had not investigated the other Sheldon Thomas, she herself would bring out the alleged Freddy Patrice lineup identification of Petitioner, as part of an explanation for the police not to have investigated the other Sheldon Thomas.[153]

238.    The court had already ruled that the prosecution could not elicit this out-of-court identification on its case in chief.

239.    As recited at ¶¶44–45 <u>supra</u>, Detective Martin had testified at the suppression hearing that Freddy Patrice had "recognized" both Sheldon Thomas and Dalton Walters at the lineups, allegedly as shooters, although Patrice had refused to sign the lineup form.[154]  When called to testify by the prosecution at trial, Patrice described the events he had witnessed but said he had fled from the shooting and had been unable to see the perpetrators, and he denied having made any identifications.[155]  Even according to the police documents and testimony, Patrice had not given any witness statement or descriptions of perpetrators before viewing the lineups.  Thus, it is quite possible—probable, even—that he was familiar with Petitioner and the co-defendant, Dalton Walters, from encounters on the street, but it is unlikely that Patrice or any of the other victims had actually seen and recognized the shooters in the car, because all the Bloods had

---

[149]  TT1558–59.
[150]  TT 792–95 (Smith); TT 1384 (Lapaix).
[151]  TT 1228–29, 1243–45 (Drummond).
[152]  TT 1560–61.
[153]  TT 1566–70.
[154]  HT 363–65; see also Ex. 9 (DD5 #43, 12/28/04).  Patrice was the "confidential witness #3" testified about at the pretrial hearing.  HT 364–65.
[155]  TT1441-49.

immediately fled upon hearing gunfire.[156]  Thus, Patrice's out-of-court identification or "recognition" may well never have happened, and if it did, it was highly unreliable.

240.    After Patrice denied at trial that he had made any lineup identifications, the prosecution asked the court for leave to elicit Patrice's alleged identifications through police testimony, but on consideration withdrew this application.  The trial court specifically said it would not have allowed it in any event.[157]

241.    Hence, Patrice's alleged lineup identification had been ruled inadmissible and would not have come into the trial at all, if defense counsel had not elicited it himself.

242.    But shockingly, counsel went ahead and himself elicited from Detective Martin that Freddy Patrice had identified Petitioner out of a lineup.[158]

243.    The prosecutor followed up by eliciting all the alleged details of this supposed identification on cross.[159]  Defense counsel put the finishing touch on by introducing the written lineup report into evidence.[160]

244.    Since co-defendant Walters's lawyer of course did not similarly elicit (and would not allow) such testimony against his own client, nothing came out at trial about Patrice's similar alleged lineup identification of Mr. Walters.  Hence, this testimony damaged only Petitioner, and in fact, it made it look as if Patrice had identified Petitioner but not Mr. Walters.

245.    In his closing, trial counsel then made the prosecution's argument—that Freddy Patrice probably had seen a shooter in the car and lied on the stand when he said he hadn't.[161]  Then it seemed to occur to trial counsel that this was damaging to his client, and suddenly he seemed to remember that he himself (trial counsel) had elicited Patrice's identification of his own client as that very shooter.

246.    Trial counsel then made an incoherent, desperate attempt to undo the damage by claiming that "there is no evidence of [Patrice's] identification in this case, none whatsoever."[162] To no avail.  Whether he remembered doing so or not, defense counsel had introduced the evidence himself.

247.    The prosecutor took full advantage of the alleged Patrice identification in her summation, dwelling on it in excruciating detail.[163]  This additional "identification," brought out by

---

[156]  See, e.g., TT 670–71 (Smith); TT 1235–36 (Drummond); TT 1368–69 (Lapaix); TT 1435–38 (Patrice).  See also Ex. 1 (DD5 #16, 12/24/04) (Barnwell).
[157]  TT 1467–68.
[158]  TT 1574–75.
[159]  TT 1592–93, 1599–1600 (Martin).
[160]  TT 1596–97.
[161]  TT 1761–62.
[162]  TT 1777–83; TT 1754–56.
[163]  TT 1846-49; TT1852–53.

Petitioner's own counsel, Mr. Patrice's denial concerning his alleged identification, undermined by Petitioner's own counsel, an "identification" that was unreliable but never shown to be unreliable, together with all the inferences that the jury was invited by the prosecution to draw about it, contributed mightily to Petitioner's conviction.

248.    This one unfathomable, devastating blow, inflicted on Petitioner by his own lawyer, would entitle Petitioner to habeas corpus relief under the Sixth Amendment if there were nothing more.  But there is more.

249.    Aliyah Charles identified Petitioner at trial as the driver of the murder car.  But Ms. Charles had told ADA Marrone on December 26, 2004, some hours after giving her street tips to Detective Martin, that she had not seen the driver's face.[164]  Counsel's cross-examination of Aliyah Charles about this resulted in her claiming that she had been too frightened of Petitioner to mention him to police.[165]  This was clearly invented on the fly, and totally false, since she had mentioned him to the police.  That was how he had come into the case.  Before giving a statement to ADA Marrone, Ms. Charles had provided Petitioner's name to Detective Martin (together with six others who had "possibly" been in the car.[166])  But counsel failed to bring this out, so the jury never discovered her falsehood.

250.    Ms. Charles's false testimony was not only prejudicial in itself (suggesting that Petitioner was too violent and frightening to name to police), but it also gave the jury reason to speculate that there had been some other, undisclosed, reason for putting Petitioner in a lineup, independent of Ms. Charles, since she claimed she had not mentioned him to police.

251.    Trial counsel had even ignored a warning from the prosecutor at sidebar that, if defense counsel continued to press Ms. Charles to explain her statement to ADA Marrone that she had not seen the driver's face, Ms. Charles would testify to (otherwise inadmissible) prior frightening encounters with Petitioner.[167]  Counsel then elicited from Ms. Charles startling details of occasions when she claimed to have seen Petitioner on the street, beating people up and shooting people for fun.[168]  This bizarre testimony was made up out of whole cloth, and it was unsupported even by Daymeon Smith (who made it his business to know such things about people in his neighborhood[169]).  The prosecutor made full use of this false and damaging testimony in closing.[170]

252.    There was still more damage done by defense counsel.

---

[164]  TT 1123–26.
[165]  TT 1159–62.
[166]  See Ex. 13 (witness chart and timeline with citations to record references).
[167]  TT1128–29.
[168]  TT 1159-67.
[169]  TT 604.
[170]  See TT 1825–26.

253.    For example, after counsel elicited from Ms. Charles that she had selected the other Sheldon Thomas, #5 from the photospread, and introduced the photospread into evidence,[171] he failed to challenge Ms. Charles's outlandish explanation for having selected #5 in the photospread—that he "looked like" Petitioner.  Counsel failed to publish to the jury Petitioner's arrest photo, which would have shown the jury that at the time of his arrest (taken four days after the crime), no reasonable person could have mistaken #5 for Petitioner—if for no other reason than Petitioner's neat, tight, elaborate cornrows, completely different from the hair on #5, whose photo Ms. Charles had selected.[172]

254.    Indeed, Petitioner's arrest photo would have shown the jury that neither Aliyah Charles nor Daymeon Smith (who also claimed at trial to have recognized Petitioner from prior sightings of him) had described this one striking characteristic of Petitioner's—an elaborate hairstyle with cornrows so distinctive that they would have been the first thing mentioned by an actual percipient witness.  Petitioner's hair had been like this during the year before the Bercy murder,[173] a fact which counsel could have established at trial through the testimony of family members, Christmas photos, and the like.[174]  But the jury never saw Petitioner's arrest photo, nor any other photo of Petitioner from the time of the crime.

255.    In striking contrast to Dalton Walters's lawyer, who made a persuasive and passionate case for his client's innocence in his closing statement, Petitioner's counsel only did more harm. He opened his statement with the unhelpful notion in this misidentification case that "whatever he did in that small, white car, even if he simply drove the car," the prosecution had not proven that Sheldon "shared the intent to kill," because their proof that he was a Crip was "filled with weak circumstance, innuendo, maybe compelling innuendo, but innuendo nonetheless, maybe attractive to think about, but innuendo nonetheless, and the great reasoning power of the witnesses in the case."[175]  Unaccountably, this argument placed his own client in the murder car, for no discernable purpose.

256.    Counsel then attempted to persuade the jury that the other Sheldon Thomas (#5 in the photo array) might be the guilty party,[176] which was simply ludicrous, and that perhaps Ernesto Sergeant (who, as explained above, had been dismissed from the case, but the jury didn't know that) might be the dark-skinned shooter on the passenger side, thus lending spurious credibility to Aliyah Charles's testimony that Petitioner was the driver.[177]

---

[171]  TT 1139–54.  Defense counsel entered the photospread into evidence at TT 787–89.

[172]  Exhibit 10 (Petitioner's arrest photo, 12/28/04).  Compare this photo with #5 in the photospread, Ex. 7 (photospread, 12/27/04).

[173]  Ex. 11 (affid. of Sheldon Thomas, 11/14/11), ¶35.

[174]  Defense counsel says that during the pretrial hearing in June 2006, he asked Petitioner's mother for a photo of Petitioner around the time of the crime, and she showed him a photo from that period.  Ex. 24 (Chaikin affirm. 03/23/12), at 3.

[175]  TT 1739–42.

[176]  TT 1791–97.

[177]  TT 1805–06 (saying that "reasonable doubt" arose from the fact that Aliyah Charles had testified to having seen a small white car driven by "someone who, look as hard as you can, has

257.    The prosecution argued in summation, with no evidence to support it, that Petitioner could have been <u>both</u> the hatless driver (as testified to by Aliyah Charles) <u>and</u> the hatted shooter (as testified to by Daymeon Smith), by leaning over Ernesto Sergeant and sticking his head out the driver's side to shoot.[178]

258.    But the ballistics evidence (whose implications had not been noted by defense counsel) had shown that to be impossible, because, given the position in which the ejected shell casings were found, the driver had to have been driving the car forward while the shooters fired their weapons.[179]

259.    The result was predictable: Petitioner was convicted.  Co-defendant Walters, who had been the original principal suspect, was acquitted.

260.    Invited by the prosecution to answer the CPL §440.10, trial counsel submitted an affirmation in which he did not even mention these gross errors.[180]  He also denied that he had attempted to persuade the jury that #5 in the photospread was an alternate perpetrator, a denial that is belied by the trial record itself, as has already been repeatedly alluded to herein.


**D.  Petitioner easily meets the Strickland test for ineffective assistance of counsel, and the state courts' adjudications of the claim of ineffective assistance of counsel was both contrary to, and involved an unreasonable application of, clearly established federal law.  28 US.C. §2254(d)(1).**

261.    To show a violation of the Sixth Amendment right to the effective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), a defendant must show that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." <u>Id</u>. at 687.  To show prejudice, defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>.

262.    There can be no doubt that had trial counsel not committed the egregious errors alleged above (as laid out in more detail in the CPL §440.10 motion and on appeal to the Appellate Division, Second Department), there is at least a reasonable probability that the result would have been different.

---

not been in this courtroom from day one" [Ernesto Sergeant], who has "very dark skin" such as that described by Daymeon Smith at TT 809.

[178]  TT 1844–45.

[179]  Numerous shell casings from two weapons were found on the street along a three-car-long stretch, and several parked cars had bullet damage, strongly indicating that the car was moving as the shots were fired.  TT 865–870 (Det. Mulvanerty); see also TT1287–98 (Det. Pelliccio). See also Ex. 32 (crime scene diagrams).

[180]  Ex. 24 (Chaikin affirm. 2/23/12).

263.    Counsel contributed to the prosecution's case, ensured Petitioner's conviction, and deprived him of the opportunity to appeal his conviction on his viable constitutional issues.  The inexcusable act of eliciting an additional unreliable identification <u>alone</u> would require the setting aside of this conviction.  Counsel's performance fell so far below any reasonable professional standard as to constitute ineffective assistance as a matter of law.

264.    Based on all the foregoing, there is more than a "reasonable probability" that, but for trial counsel's inexplicable blunders and failures, the outcome of the suppression hearing would have been different or that at any rate that Petitioner would have been acquitted at a properly conducted trial.  The state courts' adjudications of this claim were contrary to the facts and contrary to clearly established Federal law.

265.    The CPL §440.10 court did not even mention most of these allegations, and merely said that counsel "employed a trial strategy that state might well have been pursued by a reasonably competent attorney."[181]  The court did not explain how a reasonably competent attorney "might well have" failed to preserve due process issues for appeal, or "might well have" elicited damaging, unreliable, and otherwise inadmissible evidence against his own client at trial, including an additional, unreliable, and repudiated out-of-court identification.

266.    This decision was both contrary to, and involved an unreasonable application of, clearly established federal law.  28 US.C. §2254(d)(1).

267.    In addition, the CPL §440.10 court indicated a belief that some of trial counsel's failures could be resolved by reference to the appellate court's prior opinion denying the direct appeal, in regard to the supposed reliability of Aliyah Charles's information as it related to the Fourth Amendment Claim, and the appellate court's impression of "overwhelming" evidence of Petitioner's guilt.[182]  For the same reasons given in Claim I above at ¶¶120–183, in regard to the suppression court's ruling and the appellate court's decision on the Fourth Amendment claim, that ruling was clearly contrary to the actual facts and therefore was based on an unreasonable determination of the facts. 28 US.C. §2254(d)(2).  In addition, the allusion to "overwhelming" evidence of Petitioner's guilt is unsupported by the record, as his conviction rests on two highly questionable identifications identifying Petitioner as two different perpetrators, plus one unreliable and repudiated identification brought out by defense counsel himself.

268.    On appeal from the denial of the CPL §440.10 motion, the Appellate Division, Second Department, like the CPL §440.10 before it, did not mention the most serious allegations made on the CPL §440.10 motion, and merely said that <u>Petitioner</u> "failed to demonstrate the absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct."[183]  But in the face of the obvious deficiencies of the performance of defense counsel, his refusal to turn over

---

[181]  Ex. 25 (dec'n and order of Del Giudice, J., 06/05/12) (denying CPL §440.10 motion), slip op. at 10.

[182]  <u>Id</u>. at 1–2; 5–10.

[183]  Ex. 26 (<u>People v. Thomas</u>, N.Y. Slip Op. 06526 (2d Dep't, Aug.12, 2015) (denying appeal from denial of CPL §440.10 motion).

his file including his notes (to throw light on the reasons for his performance), and his failure to address in his affidavit the most serious deficiencies with which he was charged in the CPL §440.10 motion,[184] it is grossly inappropriate to assert that Petitioner loses because he did not fulfil the impossible burden of "demonstrating" the negative proposition concerning the absence of "a strategic or other legitimate explanation for counsel's allegedly deficient conduct." Indeed, the appellate court's opinion appears to concede that the record establishes such a deficiency prima facie, and under those circumstances it should be for the prosecution, through trial counsel or otherwise, to affirmatively establish such "strategic or other legitimate explanation" for counsel's obvious and egregious failures.

269.    The lack of strategic or other legitimate explanations for counsel's deficient conduct is glaringly obvious from the fact that counsel had no explanation whatsoever for having done what he did.  Furthermore, there can simply be no explanation for eliciting damaging evidence against one's own client at trial that is otherwise inadmissible, which probably explains his failure to mention it.[185]

270.    The decision of the Appellate Division, Second Department, hence, was also both contrary to, and involved an unreasonable application of, clearly established federal law.  28 US.C. §2254(d)(1).

271.    In addition, to the extent that the appellate court was (like the CPL §440.10 court before it) relying on its own previous opinion, given in regard to the Fourth Amendment claim, to support its decision on the claim of ineffective assistance of counsel, this decision was clearly contrary to the actual facts, as shown above in in Claim I above at ¶¶120–183, and therefore was clearly based on an unreasonable determination of the facts.  28 US.C. §2254(d)(2).

## CONCLUSION AND REQUEST FOR RELIEF

272.    For the foregoing reasons, the New York state courts' adjudications of the exhausted claims set forth above were contrary to, or involved an unreasonable application of, clearly established federal law, within the meaning of 28 US.C. §2254(d)(1), or were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, within the meaning of 28 U.S.C. §2254(d)(2), or both.  See Williams v. Taylor, 529 U.S. 362 (2000).

273.    WHEREFORE, Petitioner respectfully requests that the Court:

274.    Issue a writ of habeas corpus and inquire into the lawfulness of Petitioner's convictions;

275.    Incorporate the entire state record as relates to this case;

---

[184] Ex. 24 (Chaikin affirm. 2/23/12).
[185] Ex. 24 (Chaikin affirm. 2/23/12).

276.    Grant Petitioner leave to supplement the electronic filing of this Petition with additional argument and such additional parts of the record as may be necessary for the Court's just disposition of Petitioner's claims;

277.    Order such discovery as may be appropriate under the circumstances;

278.    To the extent that the Kings County District Attorney's Office has better copies of documents than those in the possession of Petitioner and his counsel (such as photos and police reports), direct Respondents to obtain and provide to Petitioner and to the Court better copies of such documents;

279.    Convene an evidentiary hearing to resolve any disputed issues of fact;

280.    Grant leave to amend the petition as may be appropriate in the light of any new facts that may emerge from such discovery or hearing;

281.    Grant leave to amend the caption of the petition;

282.    After full consideration of Petitioner's claims, set aside Petitioner's convictions; and

283.    Grant Petitioner such other relief as may be appropriate in the interests of justice.


Dated:  New York, N.Y.                    Donald Yannella PC
            February 18, 2016
                                                    /S/

                                                    By:  Donald J. Yannella, Esq.
                                                    Attorney at Law
                                                    233 Broadway, Suite 2370
                                                    New York, NY  10279
                                                    (212) 226-2883
                                                    nynjcrimlawyer@gmail.com
                                                    Attorney for Petitioner Sheldon Thomas


**VERIFICATION**


DONALD J. YANNELLA declares under penalties of perjury:
I am counsel for Petitioner Sheldon Thomas.  My offices are in New York, New York.  I am a member in good standing of bar of the United States District Court, Eastern District of New York, and I am not the subject of any disciplinary action in this or any other state or federal court.  In my capacity as attorney for Petitioner I am making this verification on his behalf. Additionally, Petitioner's affidavit, submitted to the CPL §440.10 court, is additionally attached as Ex. 11.

I have read the foregoing petition for a writ of habeas corpus, and declare that the contents of the petition are true and correct to the best of my knowledge and belief. The documents submitted are true and correct copies of the documents to which I have access.

Executed this 18th day of February, 2016

                  __/S/_____
                  Donald J. Yannella, Esq.

**Index of selected exhibits attached to this electronic filing**

Ex. 1          DD5 #16, 12/24/04 (interview of Michael Barnwell)

Ex. 2          DD5 #17, dated 12/24/04 (interview of Kadeem Drummond)

Ex. 3          DD5 #14, dated 12/24/04 (Det. Katranakis)

Ex. 4          DD5 #30, dated 12/26/04 (interview of Kadeem Drummond)

Ex. 5          Det. Martin's spiral notebook

Ex. 6          DD5 # 34, dated 12/27/04 (interview of Daymeon Smith)

Ex. 7          Photospread, 12/27/04

Ex. 8          DD5 #42, dated 12/28/04

Ex. 9          DD5 #43, dated 12/28/04

Ex. 10         Petitioner's arrest photo, 12/28/04

Ex. 11         Affidavit of Sheldon Thomas, dated 11/14/11

Ex. 12         DD5 #51, dated 1/21/05

Ex. 13         Witness chart and timeline with full citations to the record

Ex. 14         Alex Ginsberg, Bungler Cop Red in Face, New York Post (June 12, 2006)

Ex. 15         Affirmation of ADA Rodriguez, 6/29/06

Ex. 16         Decision and order of the Hon. Vincent Del Giudice, J.S.C., slip op., 07/13/06

Ex. 17         People v. Thomas, (2d Dep't, Sept. 15, 2009), slip op. (denial of direct appeal) (reported as 65 A.D.3d 1170).

Ex. 18         People v. Thomas, 13 NY.3d 942 (Jan. 6, 2010)) (denying leave to appeal from denial of direct appeal)

Ex. 19         People v. Thomas, 79 A.D.3d 1153 (2nd Dep't, Dec. 28, 2010)) (denying coram nobis motion)

Ex. 20         People v. Thomas, 17 N.Y.3d 802 (June 29, 2011) (denying leave to appeal from denial of coram nobis)

Ex. 21        Affidavit and report of Brian Sheppard, dated 12/09/11) ("Sheppard study")

Ex. 22        Affidavit of Petitioner's grandmother, Lurline Coke, dated 11/8/11

Ex. 23        Affidavit of Petitioner's mother, Pauline Williams, dated 11/18/11

Ex. 24        Attorney affirmation of Steven J. Chaikin, Esq., 03/23/12

Ex. 25        Decision and order of Del Giudice, J., 06/05/12) (denying CPL §440.10 motion)

Ex. 26        People v. Thomas, N.Y. Slip Op. 06526 (2d Dep't, Aug.12, 2015) (denying
              appeal from denial of CPL §440.10 motion)

Ex. 27        Order of the New York Court of Appeals (Leslie E. Stein, J., 01/15/16) (denying
              leave to appeal)

Ex. 28        Sentencing minutes

Ex. 29        A copy of the Index to the appendix of articles submitted to the CPL §440.10
              court and made part of the record of the CPL §440.10 motion

Ex. 30        Hynes Endorses Double-Blind Police Lineups, 228 N.Y.L.J. 9 (Dec. 13, 2002),
              submitted to the CPL §440.10 court as Ex.B-26

Ex. 31        Lisa Steele, Trying Identification Cases: An Outline for Raising Eyewitness ID
              Issues, CHAMPION 8 (Nov. 2004), submitted to the CPL §440.10 court as Ex.B-64

Ex. 32        Police crime scene diagrams