SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 25
-------------------------------------------------------------------- x
PEOPLE OF THE STATE OF NEW YORK

                                              IND. NO. 8251/2004

vs.

DALTON WALTERS,                DECISION
ERNESTO SERGEANT,          AND ORDER
SHELDON THOMAS,
                    Defendants.
-------------------------------------------------------------------- x

VINCENT M. DEL GIUDICE, J.

The Indictment herein charges the defendants, on an acting in concert theory, with Murder in the Second Degree and lesser charges.

A court of coordinate jurisdiction granted defense motions for suppression hearings, as follows: Dunaway/Payton/Mapp/Huntley/Wade for defendant Walters; Dunaway/Wade for defendant Sergeant; Dunaway/Payton/Wade/Huntley for defendant Thomas.

Combined suppression hearings for all defendants were conducted before this court, beginning on June 5, 2006 and, with various adjournment dates, ending on June 26, 2006.

The People presented four witnesses, Police Detectives Robert Reedy, Michael Martin (now retired) and Peter Manceri, and Police Sergeant Michael Murphy. The police witnesses exhibited varying degrees of difficulty in recalling and relating relevant events leading to the arrests herein and thereafter. In this connection, I credit the testimony of Detective Reedy regarding the identification procedures conducted in this case only as corrected by this

witness upon his explanation that, in his initial testimony he had confused the facts of the lineup identification procedures with the facts of the photo array identification procedures. In all other respects, I credit the testimony of the People's witnesses, and find it to be reliable to the extent indicated below.

Defendant Thomas presented the testimony of one witness, Pauline Williams (defendant Thomas' mother). Likewise, I credit this witness' testimony, and find it to be reliable to the extent indicated below.

Defendant Walters presented the testimony of one witness, Matthew Walters (defendant Walters' father), whose testimony I find to be credible only insofar as it corroborates the testimony of the People's witnesses.

## Findings of Fact

Based upon the testimony that I find to be credible and reliable, I find the facts as follows.

On December 24, 2004, Detectives Reedy and Martin were assigned to investigate a drive-by shooting incident that had occurred earlier that day, reportedly by gang-affiliated individuals driving by in a white car and shooting at a group of people on the street. The incident resulted in the death of one of the individuals on the street (14 year old Anderson Burcy) and the wounding of another (Kadeem Drummond).

Between December 24 and December 27, 2004, Detective Martin interviewed Kadeem Drummond at Kings County Hospital and went to the scene of the shooting incident (East 52nd Street and Snyder Avenue), interviewing individuals who were present at the time in question.

During this initial investigation, Detective Martin learned that there were three or four young black males in the white car; that the shooting was aimed at six young black males who were on the street; and that some gang-related dispute might have motivated the shooting.

Information received by Detective Martin from the surviving complainants and an identified eyewitness referred to for hearing purposes as Confidential Witness #1, was that one of the perpetrators was known by the name "Yellow" (reported by other Detectives in the Precinct to be the street name of defendant Walters, a member of the "outlaw" gang known to frequent the area of East 52nd Street and Church Avenue); that another of those individuals was known by the names "Shelly", "Sheldon", "Loke" or "Smoke" and "Kurn" (phon.); and that another of those individuals was known by the name "Haz". Detective Martin was also aware of telephone calls to the Precinct House from unknown callers, who reported similar information. One such caller, in addition to giving the name of one of the perpetrators as "Sheldon", gave the address for "Sheldon" as 384 East 48th Street.

On December 26 and December 27, 2004, Detective Martin spoke personally with Confidential Witness #1, who told him that she had observed "Yellow" firing a handgun from the white car and that she had heard the surviving complainants identify "Yellow" and "Sheldon" as two of the perpetrators.

Through computer checks by name, address and description, Detective Martin learned that defendant Sergeant was known by the name "Kurn" (phon.) and obtained a computer-generated photograph of an individual named "Sheldon Thomas" a male black, teens to early twenties (later discovered to be the photograph of an individual resembling defendant

3

Thomas, but in fact not that of defendant Thomas).

On December 27, 2004, Detective Martin showed a six-photo computer-generated photo array (entered into evidence as People's Exhibit #1) to Confidential Witness #1, who identified photo #5 (actually the photograph of an individual named "Sheldon Thomas", who resembles defendant Thomas) as one of the individuals she observed shooting from the white car. However, Confidential Witness #1 added that she was "not 100% sure" and would have to see the individual in person "to be 100% sure". Detective Martin showed another six-photo array (entered into evidence as People's Exhibit #2) to Confidential Witness #1, who identified photo #5 (defendant Walters) as one of the individuals shooting from the white car.

Detective Martin attempted, separately, to show People's Exhibit #1 to another identified witness, referred to for hearing purposes as Confidential Witness #2, but Confidential Witness #2 refused to look at any photo array.

On the night of December 27 - 28, 2004, Sergeant Murphy was shown photographs of two individuals sought in connection with the shooting herein. One photograph was of defendant Walters, and the other was a mug shot of defendant Thomas. Sergeant Murphy was also given their respective nicknames and addresses, and his assignment was to apprehend them.

At approximately 2:30 a.m. on December 28, 2004, Sergeant Murphy, accompanied by two Detectives and uniformed officers in a marked patrol car, went to the address given for defendant Walters. They knocked on the front door, which was opened by Matthew Walters (defendant Walters' father; herein "Mr. Walters"). After ascertaining that defendant Walters was in the house, the police told Mr. Walters that they wanted to speak with his son.

4

Walters, using a standard Miranda form entered into evidence as People's Exhibit #10. Defendant Walters acknowledged his understanding of each warning, waived the rights recited, and indicated that he was willing to answer questions, both orally and in writing on the form, which defendant Walters signed. The interview room was approximately 10' x 12', containing a table and a few chairs; Detective Reedy was "in and out" of the room during the interview; defendant Walters was not handcuffed; opportunity for food, drink and restroom was offered to and accepted by defendant Walters; defendant Walters appeared to be alert and appropriately responsive to questions; and no threats or promises were made to him. Defendant Walters made various oral statements, essentially exculpatory in nature, and was returned to the holding cell by Detective Martin.

At approximately 9:15 a.m. on December 28, 2004, Detective Martin brought defendant Thomas from a holding cell to the same interview room. There, Detective Martin re-administered the Miranda warnings to defendant Thomas, using a standard Miranda form entered into evidence as People's Exhibit #8. Defendant Thomas acknowledged his understanding of each warning, waived the rights recited, and indicated that he was willing to answer questions, both orally and in writing on the form, which defendant Thomas signed. Again, Detective Reedy was "in and out" of the room during the interview; defendant Thomas was not handcuffed; opportunity for food, drink and restroom was offered and accepted by defendant Thomas; defendant Thomas appeared to be alert and appropriately responsive to questions; and no threats or promises were made to him. Defendant Thomas made various statements, essentially exculpatory in nature. When Detective Martin, then only in defendant Thomas' company, told defendant Thomas that he had been identified by

8

numerous witnesses as a perpetrator in this case, including a photo array identification, defendant Thomas expressed surprise. Detective Martin then showed the head-shot photo array containing what Detective Martin believed to be defendant Thomas' photo (photo #5 in People's Exhibit #1), and defendant Thomas said "That's not me". Detective Martin studied the photo in question carefully, noted a likeness to defendant Thomas regarding various facial features, but came to the conclusion that the photo was not, in fact, that of defendant Thomas.

While Detective Martin was conducting the interviews of defendants Walters and Thomas, lineups directed by Detective Reedy were being set up. Three eyewitnesses were contacted and asked to come to the Precinct House to view the lineups. Defendant Thomas was then in the interview room and defendant Walters was in the holding cell.

Confidential Witness #1 was the first to arrive at the Precinct House and she was placed in the Detective Squad Robbery Investigation Office. Confidential Witness #2 and another individual, designated for hearing purposes as Confidential Witness #3, arrived sometime thereafter and were placed in the Precinct Payroll Office. At no time prior to viewing the lineups did any of the witnesses see defendants Walters or Thomas, or any of the fillers.

Confidential Witness #1 first viewed the lineup containing defendant Thomas (entered into evidence as People's Exhibit #5). Defendant Thomas chose the #6 position and all subjects wore shower caps to prevent any suggestiveness regarding hairstyle. Confidential Witness #1 was brought to the viewing room by Detectives Martin and Reedy and asked to let them know if she recognized anyone and, if so, from where. Confidential Witness #1

9

identified #6 (defendant Thomas) as "one of the guys in the car." Then Confidential Witness #1 was brought back to the Robbery Investigation Office.

Shortly thereafter, the lineup containing defendant Walters (entered into evidence as People's Exhibit #3) was completed. Defendant Walters chose the #3 position. Again, Confidential Witness #1 was brought to the viewing room and was asked to advise if she recognized anyone and, if so, from where. Confidential Witness #1 identified #3 (defendant Walters) and said, "He was one of the ones shooting from the car."

Approximately two hours after Confidential Witness #1 viewed the lineups, Confidential Witnesses #2 and #3, separately, viewed a lineup containing defendant Thomas (entered into evidence as People's Exhibit #6), and a lineup containing defendant Walters (entered into evidence as People's Exhibit #4). Defendant Thomas chose the #6 position (and again all subjects wore shower caps), and defendant Walters chose the #3 position. Confidential Witnesses #2 and #3 were given the same instructions as were given to Confidential Witness #1.

Confidential Witness #2 first viewed the lineup containing defendant Thomas and identified #6 (defendant Thomas) as "one of the ones that was shooting from the car."

Confidential Witness #2 then viewed the lineup containing defendant Walters and identified #3 (defendant Walters) as "one of the guys that was shooting from the car."

To avoid contact with Confidential Witness #3 (who was still in the Payroll Office), Confidential Witness #2 was brought to the Robbery Unit Office after viewing the two lineups.

Confidential Witness #3 then viewed the lineup containing defendant Thomas and

identified #6 (defendant Thomas) as "one of the ones shooting from the car."

Confidential Witness #3 then viewed the lineup containing defendant Walters and identified #3 (defendant Walters) as "one of the guys that was shooting from the car."

Utilizing the information received from various eyewitnesses that one of the perpetrators was known by the name "Kurn" (phon.), in January 2005 Detective Martin entered that name into the police computer, which identified it as the nickname of "Ernesto Sergeant". Since the relevant case involved a sealed Family Court file, for which any records and/or photographs were unavailable, Detective Martin entered the name "Ernesto Sergeant" into the Police Department's Photo Imaging System and obtained a photograph of defendant Sergeant. One January 21, 2005, that photograph was placed in the #1 position in duplicate six-photo arrays (entered into evidence as People's Exhibits #11 and #12, respectively).

On January 21, 2005, People's Exhibit #11 was shown by Detective Martin to Confidential Witness #1, at a residence. Detective Martin asked Confidential Witness #1 to let him know if she recognized anyone and, if so, from where. Confidential Witness #1 identified photo #1 (defendant Sergeant) and stated "He was one of the individuals in the car". Confidential Witness #1 requested that if a future lineup were conducted she would like to see profiles as well as faces.

On January 26, 2005, People's Exhibit #12 (the duplicate photo array containing defendant Sergeant's photo in the #1 position) was shown by Detective Martin to Confidential Witness #2, at the District Attorney's Office. Detective Martin asked Confidential Witness #2 to let him know if he recognized anyone and, if so, from where. Confidential Witness #2 identified photo #1 (defendant Sergeant) "as being in the car",

11

known as "Kurn" (phon.), and known "from having a fight in school with him."

Pursuant to Court Order dated May 11, 2005 (entered into evidence as Defense Exhibit D), and with defendant Sergeant's consent, defendant Sergeant was directed to appear in a lineup to be conducted at the 67th Precinct House, with counsel to be present.

On May 13, 2005, Detective Reedy directed that a lineup containing defendant Sergeant be prepared (entered into evidence as People's Exhibit #7). This was a double-blind lineup, with defendant Sergeant's counsel present. When defendant Sergeant arrived at the Precinct House, he was placed in a holding cell. Confidential Witnesses #1 and #2 arrived at the Precinct House separately and were placed, respectively, in the "RAM" office and in the Payroll Office. At no time prior to viewing the lineup did either Confidential Witness #1 or Confidential Witness #2 see defendant Sergeant, or any of the fillers.

Defendant Sergeant chose the #4 position, and all participants wore shower caps. Detective Manceri, who conducted the lineup procedures, was unaware of the subject of the lineup or his position in the lineup.

Confidential Witness #1 was brought to the viewing room by Detective Reedy, who was not present for the viewing. Detective Manceri asked Confidential Witness #1 to let him know if she recognized anyone and, if so, from where. Confidential Witness #1 made no identification and was then escorted by Detective Manceri to Detective Reedy.

Confidential Witness #2 was then brought to the viewing room by Detective Reedy, who again was not present for the viewing.

Detective Reedy and Detective Hector then drove Confidential Witness #1 home. During the trip, Confidential Witness #1 told Detective Reedy that she "thought it was

12

number four" (defendant Sergeant) but that she "wasn't sure."

Detective Manceri asked Confidential Witness #2 to let him know if he recognized anyone and, if so, from where. Confidential Witness #2 identified #4 (defendant Sergeant).

Following the lineup procedures, Detective Manceri advised Detective Reedy of the results of the lineup viewings and recorded them on a DD-5 form, which he delivered to Detective Reedy. That form was lost and Detective Manceri has no recollection of Confidential Witness #2's response regarding from where he recognized defendant Sergeant.

## Conclusions of Law

On December 27, 2004, the police had probable cause to arrest defendant Walters, based upon the photo array identification of him by an eyewitness as one of the shooters herein (see e.g., People v. Baptiste, 201 AD2d 659; People v. Higgins, 178 AD2d 199, lv denied 80 NY2d 832). Contrary to defendant Walters' argument, review of the photo array containing six head-shot photos, including that of defendant Walters, indicates that defendant Walters' photo is in no way unduly suggestive. Rather, the individuals depicted, although not clones, are of sufficiently similar appearance to preclude the likelihood that defendant Walters' photo would be singled out for identification.

Also contrary to defendant Walters' argument, no Payton violation occurred when the police went to a residence occupied by defendant Walters and his father, since they were permitted entry into the house by defendant Walters' father (see, e.g., People v. Gonzalez, 222 AD2d 453, lv denied 88 NY2d 848). In this connection, since the police had probable cause to arrest defendant Walters, even if there were a Payton violation in connection with the police entry into the residence, any such violation would not require

13

suppression of the subsequent lineup identifications (People v. Jones, 2 NY3d 235, 243).

However, I find that the police unlawfully entered defendant Walters' bedroom and opened a bureau drawer that contained two guns and ammunition. Contrary to the People's arguments, neither defendant Walters nor his father granted the police permission to enter the bedroom or to open the bureau drawer and the seizure of the contraband was not justified under the plain view exception to the warrant requirement (see e.g., People v. Brown, 96 NY2d 80, 89).

The police properly administered Miranda warnings to defendant Walters prior to his oral statements at the Precinct House. Defendant Walters acknowledged his understanding of each of the rights and made a knowing, intelligent and voluntary waiver thereof before making essentially exculpatory statements (see, Miranda v. Arizona, 384 US 436).

Review of the photographs of the lineups containing defendant Walters confirms that all fillers were sufficiently similar in appearance (i.e., in age, build, hairstyle, skin tone, and facial features) to assure that the lineup procedures were not unduly suggestive. Any differences in height were minimized by having all subjects seated. Thus, contrary to defendant Walters' argument, the lineup procedures were not unduly suggestive (see, People v. Chipp, 75 NY2d 327, cert denied 498 US 833). In this connection, this court notes that three individuals, including defendant Walters, were wearing red during the first lineup procedure conducted on December 28, 2004 and, contrary to defendant Walters' argument, defendant Walters' red t-shirt did not serve to call undue attention to him.

Further, contrary to defendant Walters' arguments, and based upon careful consideration of all credible and reliable testimony presented at the hearing, there is no support in the record for a claim of wide-ranging police misconduct involving "directed" photo array and lineup identifications and the use of force against defendant Walters' father to gain entry into the residence occupied by defendant Walters and his father.

Based on all of the above, defendant Walters' motion to suppress physical evidence is granted, and his motions to suppress statements and identifications are denied.

On January 21, 2005, the police had probable cause to arrest defendant Sergeant, based upon the separate photo array identifications of him by two eyewitness as one of the individuals in the white car (see, e.g., People v. Baptiste, supra; People v. Higgins, supra). Contrary to defendant Sergeant's arguments, there is no evidence before this court to support any claim of police misconduct in the display of the photo array to one of the eyewitnesses at a residence.

Defendant Sergeant was properly placed in a lineup on May 13, 2005, based upon a Court Order and with the consent and presence of his attorney. Contrary to defendant Sergeant's arguments, review of the photographs of this lineup confirms that all fillers were sufficiently similar in appearance (i.e., in age, build, skin tone, and facial features) to assure that the lineup procedures were not unduly suggestive. Any differences in height, weight, and/or hairstyle were minimized by having all subjects seated and wearing shower caps. Thus, contrary to defendant Sergeant's argument, the lineup procedures were not unduly suggestive (see People v. Chipp, supra).

Further, contrary to defendant Sergeant's argument, there is no evidence before

15

this court to support a claim that, following Confidential Witness #1's viewing of the May 13, 2005 lineup without identifying anyone therein, Detective Reedy improperly communicated to Confidential Witness #1 that she should have identified the individual in the #4 position (defendant Sergeant).

Based on the foregoing, defendant Sergeant's motion to suppress any lineup identification is denied.

On December 27, 2004, the police had probable cause to arrest defendant Thomas, based upon information received from Kadeem Drummond and Confidential Witness #1, as well as verified information received from unknown callers, identifying him as one of the perpetrators. Specifically, the police had information that one of the perpetrators was a young male black known as "Shelly", "Sheldon", "Loke" or "Smoke", and "Kurn" (phon.). The police also had information from one unknown caller that one of the perpetrators, identified as "Sheldon", lived at 384 East 48th Street. Utilizing computer checks by name, address and description, Detective Martin confirmed that defendant Thomas, known also as "Smoke" and "Kurn" (phon.), indeed lived at the reported address. Regarding the issue of probable cause to arrest defendant Thomas, it is of no legal consequence that the computer check had generated a photo of another individual named "Sheldon Thomas", that resembled defendant Thomas and that may have been relied upon in good faith by the apprehension team (see, e.g., People v. Fabian, 126 AD2d 664; see, also, People v. Wright, 100 AD2d 523, lv denied 62 NY2d 994). In this connection, it is of note that although prior to defendant Thomas' arrest herein, Confidential Witness #1 had identified the photo of the other "Sheldon Thomas" in a

16

photo array, Confidential Witness #1 added that she was "not 100% sure" and would have to see the individual in person "to be 100% sure". Further, Sergeant Murphy testified that, prior to defendant Thomas' arrest herein, he had viewed a mug shot photo of defendant Thomas.

Although the police had probable cause to arrest defendant Thomas when they knocked on the door of his residence, I find insufficient evidence of exigency to support forceful entry into the house (see, People v. Mitchell, 39 NY2d 173, 177-178, cert denied 426 US 953). In this connection, Sergeant Murphy testified that he had directed the door be "taken" for the safety of individuals in the premises and police officers outside, based upon his observation of defendant Thomas inside, his knowledge that defendant Thomas was wanted in connection with a recent fatal shooting, an audible "commotion" coming from individuals in a rear portion of the premises, and his desire to prevent defendant Thomas from fleeing. Defendant Thomas' mother testified that the "commotion" was attributable in large part to the "crying" and "screaming" of two children who had been awakened and disturbed by the police banging on the door and the attempts of adults in the house to determine "what was going on". Further, Sergeant Murphy acknowledged that defendant Thomas was in his view at the time he heard the "commotion"; that at the point he directed the door to be kicked in and defendant Thomas was seized, no one was in danger from any action of defendant Thomas; and that once defendant Thomas was brought out of the house he did not check to see if anyone in the rear portion of the premises was in need of assistance.

Notwithstanding the Payton violation in connection with the police entry into

17

defendant Thomas' residence, since the police had probable cause to arrest defendant Thomas, such violation would not require suppression of the subsequent lineup identifications (People v. Jones, supra).

The police properly administered Miranda warnings to defendant Thomas prior to his oral statements at the Precinct House. Defendant Thomas acknowledged his understanding of the rights and made a knowing, intelligent and voluntary waiver thereof before making essentially exculpatory statements (see, Miranda v. Arizona, supra). However, since defendant Thomas' statements were obtained as a direct result of the Payton violation, those statements must be suppressed (see, People v. Jones, supra, at 240).

Review of the photographs of the lineups containing defendant Thomas confirms that all fillers were sufficiently similar in appearance (i.e., in age, build, skin tone and facial features) to assure that the lineup procedures were not unduly suggestive. Any differences in height and hairstyle were minimized by having all subjects seated and wearing shower caps. Thus, contrary to defendant Thomas' argument, the lineup procedures were not unduly suggestive (see, People v. Chipp, supra).

Based on the foregoing, defendant Thomas' motion to suppress statements is granted and his motion to suppress identifications is denied.

This constitutes the Decision and Order of the court.

Dated: Brooklyn, New York
       July 13, 2006

                                                    Vincent M. Del Giudice
                                                    Judge of the Court of Claims
                                                    Acting Supreme Court Justice