UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
SHELDON THOMAS
:
:
                              Petitioner,    :    **MEMORANDUM DECISION AND**
:    **ORDER**
         – against –           :
:
STATE OF NEW YORK DEPARTMENT OF    :    11-cv-01119 (AMD)
CORRECTIONS, et al.
:
:
                              Respondents.   :
X
--------------------------------------------------------------

**ANN M. DONNELLY**, District Judge.

   The petitioner, Sheldon Thomas, seeks a writ of habeas corpus pursuant to 28 U.S.C. §

2254.  The petitioner was convicted in Kings County Supreme Court of Murder in the Second

Degree and related crimes, and was sentenced to a total prison sentence of 25 years to life.  The

petitioner challenges his conviction under the Fourth, Sixth, and Fourteenth Amendments.

Specifically, he asserts that the state court should have suppressed the witnesses' identifications of

him, and that he was denied the effective assistance of counsel.[1]  For the reasons that follow, the

petition is denied.

### FACTUAL BACKGROUND

1.  Overview

   The petitioner's conviction arose out of a gang related shooting.  On December 24, 2004,

fourteen-year-old Anderson Bercy and a group of friends were walking south on East 52nd Street

---

[1] Discerning the precise nature of the petitioner's claims is no easy task.  The petition, although filed by counsel, is
48 pages long and single spaced.  It does not separate the evidence at the various legal proceedings from the arguments.
Instead, the arguments are interspersed with statements about what is alleged to have transpired in state court.
Nevertheless, I have undertaken a thorough review of all submissions, including the voluminous state court record.

1

in Brooklyn; all were members of an East Flatbush street gang. A white car pulled up alongside the group, and two shooters opened fire from the passenger side. Bercy was shot in the upper chest and died soon after. Another person in the group, Kadeem Drummond, also was shot but survived.

2. Investigation

On December 24, 2004, Detective Robert Reedy of the 67th Precinct and Detective Michael Martin of the Brooklyn South Homicide Squad were assigned to investigate Anderson Bercy's murder. (ECF 35-1 at 7.) As part of the investigation, the detectives attempted to interview the people who were with the victims at the time of the shooting. They interviewed Kadeem Drummond, who told them that the shooting might be related to an altercation he had two days earlier with someone nicknamed "Yellow." (ECF 35-31 at 1.) Another detective interviewed Aliyah Charles, the girlfriend of Kirk Lapaix, who was with Bercy and Drummond at the time of the shooting. Charles was in Lapaix's apartment at the time of the shooting, and told the detective that she went to the window after hearing shots, and saw a white car drive away. (ECF 35-32 at 2.) Charles claimed not to have seen anything else, and that the only thing she knew about the car was that it had tinted windows. (*Id.*)

On December 26, 2004, detectives interviewed Daymeon Smith. (ECF 35-35 at 1.) Smith said that at least four people were in the white car, and said that one of the shooters was a "dark-skinned black male" wearing a dark blue "muffin" hat (a winter hat with earflaps), who fired a gun out of the right rear window. (*Id.*) Smith said that he would recognize the man if he saw him again. (*Id.*)

The same day, Aliyah Charles went to the 67th Precinct and gave an audiotaped statement to an assistant district attorney. She also gave Detectives Martin and Reedy a list of seven people who "might have been" in the white car. (ECF. 35 at 4.) The list included the following names:

2

Yellow, Smokey, Shelly, Kern, Has, O'Neil, and Chris. (*Id.*) Detective Martin learned from other officers that "Yellow" was Dalton Walters, a member of the Outlaws gang, "Shelly" was Sheldon Thomas, a member of the Crips, and "Kern" was Ernesto Sergeant, who was not affiliated with a gang. (*Id.*)

### 3. The Photographic Arrays, Arrest, and Line-ups

Detective Martin assembled two photographic arrays. One array included Dalton Walters' photograph. The second array included a photograph of someone named Sheldon Thomas, but it was not the petitioner. (ECF 36-2 at 84-85.) This photograph was in the fifth position of the six photograph array. (*Id.*) Aliyah Charles looked at the array and identified photograph number five—the other Sheldon Thomas—as "one of the guys in the white car." (*Id.* at 86-87.) She said that she was "ninety percent sure" about her identification, but needed to see him in person to be certain. (*Id.*) Thinking that she had identified the petitioner, detectives arrested him at his home. (*Id.* at 90-91.)

After advising the petitioner of his constitutional rights, Detective Martin told him that a witness had identified his photograph in connection with the murder, and showed him the array. (*Id.* at 92.) When the petitioner responded that he was not the person in the photograph, Martin realized that the array contained the photograph of a different Sheldon Thomas. (*Id.*) Nevertheless, the detectives placed the petitioner in a line-up on December 28, 2004. (*Id.* at 93-98.) Three witnesses separately viewed the line-up: Aliyah Charles, Daymeon Smith, and Freddy Patrice. (*Id.* at 97; ECF 35-37 at 1; ECF 35-38 at 1.) Charles identified the petitioner as one of the people in the white car, while Smith and Patrice identified the petitioner as one of the shooters. (ECF 36-2 at 97; ECF 35-37 at 1; ECF 35-38 at 1.) Smith and Patrice refused to sign the line-up forms. (ECF 35-37 at 1; ECF 35-38 at 1.)

The police arranged another line-up with Dalton Walters as the subject. (ECF 36-2 at 96-97.) Charles and Patrice identified Walters as one of the shooters from the white car; Smith identified him as someone from the neighborhood, but said that he was not in the car. (*Id.* at 96-97.)

On May 13, 2005, the police conducted a third line-up with Ernesto Sergeant as the subject. (*Id.* at 98-99.) Smith identified Sergeant; Charles did not. (*Id.* at 98-99.)

4. Pre-Trial Hearings

Prior to trial, the petitioner and his co-defendant, Dalton Walters, moved to suppress the photographic and line-up identifications. Pretrial hearings began on June 5, 2006 before the Honorable Vincent Del Guidice.

a. *The Prosecution's Case*

Detective Robert Reedy testified on direct examination that that both Aliyah Charles and Daymeon Smith identified the petitioner's photograph from an array as one of the people in the white car.[2] (ECF 35-2 at 14.) Reedy also identified the petitioner in court as the person in the array. On cross-examination, however, the petitioner's attorney established that the person in the array was not the petitioner, but another man whose name was also Sheldon Thomas, a fact that the prosecutor acknowledged.[3] (*Id.* at 35-39.) The petitioner's counsel then argued that because no witness had actually identified the petitioner in the photo array, the police did not have probable cause for the arrest, and the line-up identifications should be suppressed. (*Id.* at 67-68.) In response to the court's questions, Reedy admitted that his statements on the stand were false when

---

[2] Pursuant to a protective order, the parties referred to Charles and Smith as Confidential Witnesses #1 and #2.
[3] It appears from the record that the prosecutor conducting the hearing was not aware, until counsel's cross examination, that the petitioner's photograph was not in the array.

he made them.  (*Id.* at 76-77.)  The court adjourned the hearing so that Reedy could consult a lawyer.  He also directed Reedy not to talk to anyone else about his testimony.  (*Id.*)

When the hearing resumed the following week, Reedy testified that he had "mixed up" the details of the photographic array and the line-ups, that Smith did not identify anyone from the photographic array, and in fact refused to look at the array.  (ECF 35-4 at 4-12.)  Reedy also testified that Aliyah Charles identified the photograph of the other Sheldon Thomas—not the petitioner.  (*Id.* at 11.)  Two days after Reedy showed the photo array to Smith and Charles, Detective Martin told him that the Sheldon Thomas in the array was not actually the petitioner, a fact that Reedy did not remember until the petitioner's counsel refreshed his recollection.  (*Id.* at 23-28.)

Reedy admitted that he conferred with Detective Martin and other detectives during the intervening weekend; they "refreshed his memory" that an anonymous caller gave them the name "Sheldon Thomas," a series of nicknames ("Shellie, Lock, Smoke"), and an address on East 48th Street.  (*Id.* at 16.)

The petitioner's counsel and Walters' lawyer filed a joint motion to strike Reedy's testimony about the anonymous call, because Reedy violated the court's order by conferring with Detective Martin, who was also going to be a witness.  (*Id.* at 44-45.)  Judge Del Guidice denied the motion, ruling that the issue was one of credibility, and that he would give the testimony "as much weight as it deserves." [4]  (*Id.* at 46.)

Detective Martin also testified about the identifications.  Aliyah Charles told him that she overheard other witnesses to the shooting say that "Sheldon" or "Shelly" and "Yellow," "Hoz", and "Kern" were involved.  (ECF 35-7 at 58.)  In addition, an anonymous caller to the precinct

---

[4] Counsels' motion for a special prosecutor was denied.

reported that one of the perpetrators lived at 384 East 48th Street. (ECF 35-5 at 17-18.) This caller mentioned "Sheldon Thomas," and gave "very detailed information," including an address and the nicknames Shelly, Loke, and Smoke or Smokey. (*Id.* at 17-23.) Like Charles, the anonymous caller identified Sheldon Thomas as a known associate of someone named "Yellow."[5] (*Id.* at 24.)

Martin entered the information into a computer and located a photograph of someone named Sheldon Thomas, who lived in the 67th Precinct, where the shooting occurred. He put together a photographic array and put that photograph in the fifth position. He made a second array with Dalton Walters' photograph. On December 27, 2004, Martin and Reedy went to Kirk LaPaix's apartment, and showed the arrays, separately, to Charles and Smith. Charles identified the Sheldon Thomas in the array as one of the shooters; she clarified that she was "ninety percent sure," and that she would have to "see him in person" to be 100 percent sure. (*Id.* at 33-35). She identified Walters' photograph from the second array. Smith refused to look at the arrays. (*Id.* at 36.)

After the petitioner's arrest, Martin advised him of his constitutional rights, which the petitioner waived. (*Id.* at 43-45.) The petitioner said that on the day of the shooting, he and a friend went to Queens at 11:30 p.m. (*Id.* at 47.) When the detective said that the shooting occurred at 9:30 p.m., the petitioner "appeared nervous," and said that he meant to say that he was in Queens at 11:30 a.m., and did not return to Brooklyn until 3:00 a.m. on Christmas. The petitioner knew Walters as "Yellow," but claimed that he had never been in a white Nissan "ever in his life." (*Id.* at 48.)

As a "bluff" to "spur more information out of him," Martin said that "numerous witnesses" had identified him. (*Id.* at 49-50.) The petitioner did not think that was possible, so Martin showed

---

[5] There was more than one anonymous call, but Martin did not personally receive or document any of the calls. (ECF 35-7 at 71.)

him the array with the photograph of the other Sheldon Thomas, and said, "There you are in position number five." (*Id.*) The petitioner replied, "That's not me." Martin looked at the photograph again, and realized that although there were "similarities," the person in the photograph was not the petitioner. (*Id.* at 51.) Nevertheless, Martin's "gut feeling" was that he had arrested "the right Sheldon Thomas," based on his investigation and on the petitioner's "answers and evasiveness." (ECF 35-7 at 65).[6]

Sergeant Michael Murphy testified about the circumstances of the petitioner's arrest. At around 3:30 a.m. on December 28, 2004, Murphy went to the front door of the petitioner's home, and saw someone, who looked like the petitioner, freeze like "a deer in headlights," and then turn around toward the back door. (ECF 35-9 at 35.) Murphy also heard screaming and "commotion" from the back room of the house. (*Id.* at 37.) Fearing for the people inside, Murphy ordered an officer to kick open the door and arrest the petitioner. (*Id.* at 37-39.)

b. *The Defense Case*

The petitioner's mother, Pauline Williams, testified about the circumstances of the petitioner's arrest. The police knocked on her door at 3:30 a.m. and asked to speak to Sheldon Thomas. (ECF 35-10 at 7.) When Williams and her fiancé did not open the door, the police banged on the door and yelled at them to "open the door." (*Id.* at 8.) Williams then woke the petitioner, who came downstairs, but refused to open the door. Williams, her mother, a couple of children, and the petitioner sat in the kitchen, while Williams' fiancé called the precinct to ask why the officers were at his home. (*Id.* at 23.) The children were crying, but the adults never raised their voices. (*Id.* at 36-37.) Eventually, an officer kicked the door open, and at least six officers

---

[6] Martin did not at that point advise anyone in the District Attorney's Office that a witness had identified a different Sheldon Thomas, nor did he prepare any reports or notes to that effect. (ECF 35-7 at 64). When he brought witnesses to testify before the grand jury, he told an assistant district attorney what had happened, but he did not remember who that person was. (*Id.* at 65).

came in, and arrested the petitioner. (*Id*. at 10.)

      c. *The Court's Decision*

In a written decision, Judge Del Guidice denied the motion to suppress the identifications and the petitioner's statements. (ECF 35-45.) He credited the testimony of the prosecution's witnesses. As for Detective Reedy, the court accepted his explanation that he had confused the details of the photographic array with the circumstances of the line-ups. (*Id*. at 10.) The judge also found that there was probable cause to arrest the petitioner, based on the information from the witnesses, including Aliyah Charles, and from the anonymous callers. (*Id*. at 13.) The judge concluded that it was "of no legal consequence" that Charles identified the photograph of a different Sheldon Thomas, because he resembled the petitioner, had the same name, and the police believed in "good faith" that the person in the photograph was the petitioner.[7] (*Id*. at 13.)

The court held that the line-up procedures were not unduly suggestive, that "all fillers were sufficiently similar in appearance," and that "[a]ny differences in height and hairstyle were minimized by having all subjects seated and wearing shower caps." (*Id*.)

5. The Trial

      a. *The Prosecution's case*[8]

         i. *Daymeon Smith*

Daymeon Smith, a member of the Bloods, had a criminal record that included an assault and attempted robbery, stealing motorcycles, threatening a police officer, and a parole violation. He knew the petitioner from the neighborhood, and saw him about twice a week during the year before the shooting. (ECF 35-14 at 3.) The petitioner was a member of the Gangsta Killa Crips,

---

[7] Judge Del Guidice agreed with the petitioner's lawyer that the "forceful entry" into the petitioner's house violated *Payton v. New York*, 445 U.S. 573 (1980), but found that the violation did not require suppression because the police had probable cause to arrest the petitioner. (ECF 35-45 at 15-16.)

[8] The charges against Ernesto Sergeant were dismissed after the hearing.

a sub group of the Crips gang. Dalton Walters, known as "Yellow," was an Outlaw. (*Id.* at 4-6.) Walters and Freddy Patrice, also a Blood, "had beef" and "didn't like each other." (*Id.*) Approximately two months before the shooting, Walters approached Smith, who was then sixteen, his best friend, fourteen-year-old Anderson Bercy, and some other Bloods, and warned them to stay away from Patrice. (*Id.* at 6-7.)

At about 8:30 p.m. on Christmas Eve, Smith was with a group of other Bloods, heading back to Kirk Lapaix's house; the group included Anderson Bercy, Kirk Lapaix, Freddy Patrice, Michael Barnwell, and Kadeem Drummond. (*Id.* at 20.) A white car with tinted windows pulled up next to the group about five feet from Smith, the front passenger window was lowered, and the petitioner, wearing a "muffin" style hat, pointed a gun through the window and started firing. (*Id.* at 21.) Smith, who heard at least ten shots from two different guns, ran, as did the rest of the group. When he reached Anderson Bercy's building, about two blocks from the shooting, Freddy Patrice was dragging Bercy into the building. Bercy was holding his chest and said that he had been shot. Kadeem Drummond was also shot. Smith ran into a deli, screaming for help. He learned later that Anderson Bercy had died from his wounds. Smith quit the Bloods two weeks after the murder. (ECF 35-15 at 7.)

After the shooting, detectives tried to show Smith two photographic arrays, but he refused to look at them. On December 28th, Smith made a line-up identification of the petitioner as the person he saw shooting from the white car. In a separate line-up, he identified Walters as someone he knew from around the neighborhood. (*Id.* at 35-38.)

On cross-examination, the petitioner's lawyer confronted Smith with his statements to the police that the shooter fired out of the right rear window, not the front passenger window. (ECF 35-15 at 22-25.) He also cross-examined Smith about his statements to the police and his grand

jury testimony that the shooter was dark-skinned. Smith said that he did not know whether the shooter had light skin, dark skin, or something in between, but agreed that the petitioner did not have dark skin.[9]  (ECF 35-16 at 3.)

## ii.  *Aliyah Charles*

At the time of the shooting, Aliyah Charles was Kirk Lapaix's "on and off" girlfriend. Lapaix was a Blood, as were his friends, including Daymeon Smith, Kadeem Drummond, and Michael Barnwell. Anderson Bercy "was like a little brother" to her. (ECF 35-18 at 8-10.) She recognized the petitioner and Walters from around the neighborhood. She had seen Walters once or twice a week for the previous four to five years, and knew him as "Yellow." (*Id.* at 10-12.) She did not know if Walters was in a gang, but knew that he associated with members of the Outlaws. (*Id.* at 12-13.) She did not know the petitioner, but had seen him in the neighborhood during the previous two years, and knew that he was a Crip. (*Id.* at 14.)

Before December of 2004, Charles saw the petitioner driving a white car, which she noticed because it had "scratches in the back." (*Id.* at 16-17.) She also saw the petitioner and Walters one time during the summer, which "caught [her] attention" because she had never seen a Crip and an Outlaw together. (*Id.*)

On December 24, 2004, as Charles left her job at Subway and walked to Kirk Lapaix's apartment at 52nd Street and Snyder Avenue, she saw Ernesto Sergeant, whom she knew as "Kern," driving the same white car that the petitioner had previously driven. (*Id.* at 19-20.) When she reached the apartment, Kirk Lapaix, Freddy Patrice, Daymeon Smith, and Anderson Bercy were there. Charles went with them to a sneaker store where they met up with Michael Barnwell. (*Id.* at 21-22.) Charles noticed the same white car drive past the sneaker store, but did not see who

---

[9] Members of the audience made threatening gestures during Smith's testimony, and were ejected from the courtroom.

was driving. (*Id*. at 22-23.) At one point, Lapaix and Patrice were "pointing and whispering," and Charles saw the white car again. (*Id*. at 24.) Lapaix then told Charles to go to his apartment because he wanted "to make sure [she was] safe." (*Id.* at 25.)

While Charles was watching television inside the apartment, she looked out the window and noticed that the white car was now parked in front of the building. She claimed that she was able to see, from the second floor, not only that the car had scratches on the back, but that the petitioner was driving, that Walters was in the back seat on the passenger side, that "Kern" was in the front seat, and that a fourth person was behind the petitioner. She left the window, and when she returned, saw the white car on the other side of the street. A few minutes later, she saw Lapaix, Drummond, Bercy, and the rest of the group walking toward the building. (*Id*. at 31-32.) As they neared the corner, "shots started coming from the white car;" Charles could tell that two guns were being fired from the front and rear passenger windows. (*Id*. at 33.) When Charles went downstairs, Lapaix was there but the rest of the group had fled. (*Id.* at 34-35.)

The police arrived within a half hour, and asked what happened. Charles told them that she did not see anything, and that the only thing she noticed about the car was that it had tinted windows; she did not want to talk to anyone because she could not believe that Anderson Bercy was dead. (*Id*. at 35-36.) On December 26, 2004, she went to the precinct and made an audiotaped statement, under oath, to an assistant district attorney, in which she said that she had only seen Walters "like once or twice" before the shooting, and that she did not see the face of the driver. (*Id*. at 67.)

On December 27, 2004, Detectives Reedy and Martin showed her a photographic array; she selected photograph number five, and said that she was ninety percent sure the person in the photograph was involved in the shooting, but needed to see him in person. (*Id*. at 37.) She looked

at separate line-ups on December 28, 2004. In the first one, she identified Walters as one of the shooters. (*Id.* at 38-39.) In the second line-up, she identified the petitioner as the driver.[10] (*Id.* at 41-43.)

Both defense lawyers cross-examined Charles extensively about her ability to see what she claimed to have seen. When the co-defendant's lawyer challenged her, Charles said for the first time that the apartment window was open, even though it was cold, and that she put her head out of the window. Co-counsel then showed her a photograph of the window, which showed that it was covered by window guards; Charles replied that those were added after the shooting. (*Id.* at 76-77.) When confronted with her earlier statement that the car had tinted windows, she said that it did not have "really tinted, tinted windows. You could see inside the car." (*Id.*). She also said that the car's interior lights were on, and that the windows were down.[11] (1096, 1098).[12]

The petitioner's attorney focused on Charles' identification of the other Sheldon Thomas, and the circumstances surrounding the photographic array and the line-ups. As part of that line of questioning, he cross-examined her about the apparent contradiction that she claimed to have known who the petitioner was, yet identified a different man from the array, saying that she was 90 percent sure that he was the person driving the car. (1139-1154.) Counsel then questioned Charles about her prior encounters with the petitioner. Charles said she was more afraid of the petitioner than anyone in the car, and claimed that he and another woman had beaten and shot people "for fun." When counsel pressed her for details about these claims, she responded, "I don't think I have to tell you that." After being admonished by the court, Charles gave dates and times

---

[10] In September of 2006, one of Dalton Walters' friends warned Charles that "snitches get stiches." (ECF 35-20 at 19.) During Charles' testimony, that same person made a threatening gesture to her in the courtroom; he put his hands together as though he was praying, and mouthed, "It's a done deal." (*Id.* at 19.) A detective testified, outside the presence of the jury, that he saw the petitioner make the same gesture during Daymeon Smith's testimony.
[11] Daymeon Smith testified that the car interior lights were not on. (ECF 35-15 at 26.)
[12] The petitioner did not file pages 1093 through 1180 of the transcript on ECF, but sent the Court a courtesy copy of the transcript that included these pages. The petitioner is instructed to file these pages on ECF.

that she claimed to have seen these events, but admitted that she did not call the police either time. Counsel finished this area of questioning by confirming that even though she was "very familiar" with the petitioner, she identified another man, and was ninety percent sure of her identification. (*Id.* at 1168.)

In addition to Charles' mistaken identification, counsel also focused on the coincidence that the photograph she selected was of a man whose name was also Sheldon Thomas, which counsel suggested was evidence that the police had told her which photograph to select. He also established that prosecutors told Charles, before her testimony, that the person that she identified in the photographic array was not the petitioner.[13]

### iii. *Kadeem Drummond*

Drummond, who was sixteen years-old at the time of the shooting, knew both the petitioner and the co-defendant. He had known the co-defendant, a member of the Outlaws, "all his life," and had a good relationship with him. (ECF 35-20 at 45-46, 60.)[14] He had known the petitioner for about four years; they worked together and "got along." (*Id.* at 64.) Two days before the shooting, while Drummond was with Bercy, Patrice, Lapaix, and others, Walters told him that he was "chilling with the wrong crowd," and "mushed" him in the face. (*Id.* at 49-52.) Drummond did not feel threatened; rather, he thought Walters' was giving him advice, like "a big brother." (*Id.* at 60-62.) On December 24, 2004, Drummond was with the group when the shooting broke out. He was struck in the shoulder by one of the bullets, but did not see the shooter. (*Id.* at 57-59.)

### iv. *Kirk Lapaix*

Twenty-three-year-old Kirk Lapaix had been a member of the Bloods for nine years at the

---

[13] The court denied counsel's request for a sanction.
[14] Drummond said that he was not a Blood, but that his friends were.

time of the trial, and dated Aliyah Charles on and off beginning in 2003. (ECF 35-22 at 28-29.) He had a conviction for attempted assault. He did not know the petitioner, and had never seen him before the trial. He did know Walters, whom he identified in court. (*Id.* at 31, 59.)

On December 24, 2004, not long before the shooting, Lapaix was walking with his friends, and saw Walters walking toward him. They exchanged greetings. (*Id.* at 37-38.) Shortly thereafter, Lapaix had a telephone conversation with Walters; he could hear the sound of a crowd in the background. (*Id.* at 55-58.) The call ended as Lapaix and his friends approached the corner of 52nd Street and Snyder Avenue, and gunshots rang out. (*Id.* at 42-44.) Lapaix ran and hid behind some bushes. (*Id.*) He did not know the direction from which the shots came or how many shots were fired, and did not see any of the shooters. (*Id.*)

### v. *Freddy Patrice*

At the time of the trial, Freddy Patrice was incarcerated on a pending robbery charge.[15] Although he had a tattoo on his neck that read "Outlaw," Patrice denied that he was a member of that or any gang, and claimed not to know the gang affiliations of any of his friends. (ECF 35-23 at 24-27.) Dalton Walters was "very much" a friend of his, and they had never had "beef." (*Id.* at 26-30.) On December 24, 2004, Patrice was with his friends when he heard shots; he ran with Anderson Bercy. When they reached the corner, Bercy said that he had been hit, and collapsed. Patrice picked him up, and continued running. (*Id.* at 28-32.) He called 911, but left the area when Bercy's family arrived.[16] Patrice said that he "never" viewed any line-ups, and had never identified anyone involved in the shooting. (*Id.* at 33, 41.)[17]

---

[15] Patrice's lawyer was in court when Patrice testified.

[16] Although neither the recording of the 911 call nor the transcript of the call is part of the record, both defense lawyers argued on summation that Patrice told the 911 operator that he could not describe the shooters. (ECF 35-27 at 45.)

[17] The court declared Patrice a "hostile witness." Patrice denied that he had conditioned his cooperation on being released from prison. Outside the presence of the jury, the prosecutor told the court that Patrice had previously told prosecutors that unless they arranged for his release from prison, he would say that he did not remember anything. (*Id.* at 40.) Martin Goldberg, Patrice's lawyer, advised the court that at one point, prosecutors promised Patrice that if he

14

vi. *Additional Evidence*

Detectives and police officers testified about the identification of Anderson Bercy's body, the crime scene processing, and the collection and analysis of ballistics evidence from two different guns—five shell casings from a nine-millimeter gun and seven shell casings from a twenty-two caliber gun. (ECF 35-21 at 29.) Another detective, Kenneth Fung, testified that the petitioner and Walters were "whispering together" while they were being transported to Central Booking. (*Id.* at 30.) A doctor from the Office of Chief Medical Examiner testified that Anderson Bercy died from a gunshot wound that perforated his heart and lung. Another doctor testified about treating Kadeem Drummond's injury, a gunshot wound to the shoulder.

Over counsel's objection, court permitted the prosecutors to introduce a partially redacted copy of the petitioner's visitor log from prison, on the theory that it demonstrated his connection to the neighborhood and that other gang members visited him. (ECF 35-20 at 2-5.)

b. *Defense Case*

i. *Ann Marie Candillo*

Ann Marie Candillo, Kirk Lapaix's mother, had lived on the second floor of 5122 Snyder Avenue for over 20 years. (ECF 35-24 at 38.) Aliyah Charles lived with her at the time of the shooting. (*Id.* at 40.) Candillo testified that there were bars on her bedroom window, which had been there for twenty years. (*Id.* at 41.) There were no bars on her son's bedroom windows. (*Id.* at 43.)

---

cooperated, his case would be "chucked." The prosecutor responded that there was no agreement with Patrice, but also said that she promised Patrice that if he testified truthfully, "we may be in a position to make him an offer that would get him out of jail shortly." (ECF 35-24 at 6.) The petitioner's lawyer objected that the defense had not been provided with this information.

### ii. *Anthony Andrews*

Anthony Andrews knew Dalton Walters as "Yellow." (*Id.* at 46.) At 8:00 p.m. on December 24, 2004, Andrews and Walters were playing video games in a laundromat on Church Avenue. (*Id.*) At one point, Walters left and walked across the street, but returned after three minutes. (*Id.* at 50.) Between 9:00 p.m. and 9:30 p.m., while Walters was in the laundromat, someone came in and told them that there had been a shooting on 51st Street. (*Id.* at 51.) Andrews, Walters, and others went to 51st Street, and saw police officers and ambulances. They saw Kirk Lapaix and asked him what had happened. They then went back to the laundromat after about fifteen minutes. (*Id.* at 53.)

### iii. *Detective Michael Martin*

The petitioner's attorney claimed that he was entitled to argue as part of his defense that "the other Sheldon Thomas,"—whose name and nickname was given to the police, who lived in the precinct where the shooting took place, and whom a witness had identified with 90 percent certainty—was the real killer, and that the police's failure to investigate him was relevant. (ECF 35-25 at 18, 27.) The court ruled that if counsel asked why the police did not pursue this investigative angle, the prosecutors would be permitted to elicit evidence that Freddy Patrice identified the petitioner in a line-up. (*Id.* at 28-30.)

The petitioner's counsel decided to pursue the strategy that the police should have investigated the other Sheldon Thomas. Detective Martin conceded that Aliyah Charles identified the other Sheldon Thomas with 90 percent certainty, that the other Sheldon Thomas lived in the 67th Precinct, that he was a suspect, and that the police had issued a "wanted" card for him, but that detectives had never gone to his address. (*Id.* at 23, 41.) In addition, Martin testified that when he entered information about the suspect into the computer, the petitioner's photograph did

not come up. Because of the court's ruling, counsel opted to bring out the fact of Patrice's line-up identification on his direct examination rather than letting the prosecutor do so, but also established that both Smith and Patrice refused to sign the line-up forms. (*Id.* at 34-35.)

The petitioner's counsel moved to call Detective Reedy to testify about what Aliyah Charles said when she looked at the photographic array. (ECF 35-27 at 14.) Reedy had testified at one point in the suppression hearing that Charles' identification of "the other Sheldon Thomas" was "pretty quick," which conflicted with Detective Martin's testimony that she said she was 90 percent sure of her identification. After a hearing held out of the presence of the jury, at which Reedy testified, the court denied the application. (*Id.* at 26-28.)

c. *The Summations*

Both defense counsel agreed that the central issue in the case was identification, and both focused on the inconsistencies in the various witnesses' accounts. Dalton Walters' attorney stressed that the none of the intended victims of the shooting placed Walters at the scene, and that at least two of them—Kadeem Drummond and Kirk Lapaix—were friendly with Walters; Drummond described him as a "brother," and Lapaix saw Walters shortly before the shooting, and even spoke to him on the telephone minutes before the shots were fired. The only witness who placed Walters in the car was Aliyah Charles, whom counsel attacked as a liar whose testimony was inconsistent with all of the other witnesses. He underscored the inconsistencies in her testimony about the identity of the shooter, whether the shooter wore a hat, whether the lights inside the car were on, and whether she could actually see what she claimed to have seen at night, from a second floor window with bars on it. He argued that Walters' alibi was convincing, and that the prosecutors had failed to establish guilt beyond a reasonable doubt. (*Id.* at 40-65.)

The petitioner's attorney adopted co-counsel's arguments, and emphasized that

17

identification was the critical issue in the case. He argued that even if the prosecutors established that the petitioner was in the car, they could not prove that he shared the intent of the shooter. Counsel also addressed the gang membership question, arguing that the prosecution had relied on innuendo rather than evidence of gang affiliation, but that, in any event, gang affiliation was not a crime. He also stressed the witnesses who did not identify the petitioner. Unlike the co-defendant, however, there were two witnesses that placed the petitioner at the scene of the shooting, and one of them, Daymeon Smith, testified that the petitioner was the shooter and that he saw him from five feet away; counsel pointed out his prior inconsistent description of the shooter as a dark-skinned man, his initial refusal to speak to the police, and the poor lighting conditions at the scene. (ECF 35-28 at 4-29.)

As for Aliyah Charles, counsel described her testimony as "so tailored, so convenient," and detailed the numerous inconsistencies—both internal and with other witnesses—in her testimony: her varying accounts of the events, including her statement to the police that the only thing she noticed about the car was its tinted windows, her trial testimony that the windows were only lightly tinted, her claim on cross examination that the car windows were actually open, and her claim that the car was parked in front of the building for a substantial period before the shooting. (*Id*. at 31.) Most significant, counsel argued, was her identification of the other Sheldon Thomas from the photographic array. He pointed out that she signed the back of the array, which was evidence of an identification, and argued that "90 percent is a positive id." (*Id*. at 34.) Counsel belittled her testimony that she saw the petitioner assault and shoot people as unworthy of belief. He also addressed Freddy Patrice's testimony, and pointed out that it did not make sense that Patrice, a Blood, would cover for the petitioner, a Crip, especially if the petitioner had shot Bercy, whom Patrice carried for a block, and for whom Patrice called 911. Counsel argued that if Patrice thought

Walters and the petitioner had shot his friend, he would have said so—that if he "could have tagged these guys in court he would have." (*Id*. at 42.) Counsel reminded the jury that Patrice told the 911 operator that he could not identify the shooters.

### d. *Verdict and Sentencing*

The jury found the petitioner guilty on all counts, and acquitted Walters. The petitioner was sentenced to serve an indeterminate prison term of from 25 years to life for the murder, and concurrent, determinate sentences for attempted murder, assault, and weapons possession. (ECF 35-57 at 9-12.)

## PROCEDURAL HISTORY

### 1. Direct Appeal

The petitioner appealed his conviction to the Appellate Division, Second Department. (ECF 36-2 at 1.) He argued that he was arrested without probable cause and that the admission of the Rikers Island visitor log was unfairly prejudicial. (*Id*. at 41-42; 66-67.) The Appellate Division affirmed the petitioner's conviction on September 15, 2009. *People v. Thomas*, 65 A.D. 3d 1170 (2d Dep't 2009). The court rejected the petitioner's probable cause claim, ruling that the "citizen informant was reliable and had some basis of knowledge for the information given to the police." *Id*. The fact that the informant identified someone else as one of the shooters was not determinative, since "the person so identified had the same name as the defendant, looked like the defendant, and lived in the same general area as the defendant." *Id*. The court concluded "that the arrest of a person who is mistakenly thought to be someone else is valid if the arresting officer (a) has probable cause to arrest the person sought, and (b) mistakenly believed the person arrested was the person sought." *Id*.

The court agreed with the petitioner's arguments about the visitor log, but found that the

error was harmless in light of the "overwhelming" evidence of the petitioner's guilt, which included the "identification of the [petitioner] by an eyewitness other than [Aliyah Charles] who had seen the [petitioner] in the neighborhood on various occasions" before the shooting. *Id.* at 1171-72. The Court of Appeals denied the petitioner's application for leave to appeal on January 6, 2010. *People v. Thomas*, 13 N.Y.3d 942 (2010).

 2. *Coram Nobis* Petition

  The petitioner, acting *pro se*, applied for a writ of error *coram nobis* on September 1, 2010, claiming that his appellate counsel was ineffective because he did not argue that the line-up was unduly suggestive, and because counsel did not include "exculpatory information" about the "citizen informant" in his probable cause argument. (ECF 36-3 at 12.) Appellate counsel submitted an affirmation in which he explained why he did not advance the arguments that formed the basis of the petitioner's claim of ineffectiveness. He did not argue that the line-up was unfairly suggestive because he concluded, based on his examination of the photograph of the line-up, that the line-up was not suggestive; the so-called "exculpatory" information that the petitioner cited— Aliyah Charles' "prior recognition of him" and her "numerous opportunities to name and implicate [the petitioner] since she knows him so well"—did not make the line-up suggestive, and was in fact evidence that the line-up was "only confirmatory." (*Id.* at 4-5.)

  The Appellate Division denied the petitioner's application on December 28, 2010, ruling that he had failed to establish that he was denied the effective assistance of appellate counsel. *People v. Thomas*, 79 A.D. 3d 1153 (2d Dep't 2010). Leave to appeal was denied on June 29, 2011. *People v. Thomas*, 17 N.Y.3d 802 (2011).

 3. 440.10 Motion

  On March 7, 2011, the petitioner petitioned this Court for a writ of habeas corpus. (ECF.

1.) Shortly thereafter, he requested and was granted a stay in order to exhaust some of his claims in state court. (ECF 6.)

On December 7, 2011, the petitioner moved before Judge Del Guidice to vacate his conviction pursuant to New York Criminal Procedure Law Section 440.10. (ECF 36-4 at 1.) The petitioner attacked the line-up and the identification evidence, accused the prosecutor of misconduct, claimed that the his trial lawyer was ineffective, and argued that he had newly discovered evidence in the form of a study commissioned by the defense, in which participants were able to distinguish between the petitioner and "the other Shelton Thomas."[18] (ECF 36-4.) Included with the motion was the petitioner's affidavit, in which he claimed that he had told his trial lawyer that he had an alibi for the time of the murder, and that he knew Detective Reedy from prior encounters, but that counsel failed to investigate the alibi or cross-examine Detective Reedy about his prior encounters with the petitioner. (*Id*. at 153-159.) He also claimed that counsel did not review the discovery materials, including the photographic array. (*Id*.)

Steven Chaikin, the petitioner's trial lawyer, submitted an affirmation in which he recalled "working diligently" on the petitioner's case. He said that he hired an investigator, and was "certain" that he followed his "usual practices" of visiting the scene, speaking to witnesses, reviewing the discovery, and doing legal research. (*Id*. at 348.) He spoke "extensively" with the petitioner and conferred with him about trial strategy. According to Mr. Chaikin, the petitioner "at no time" mentioned an alibi, never told him that he knew Detective Reedy, or that his photograph was not in the array that detectives showed to Aliyah Charles. (*Id*. at 348-350.) Mr. Chaikin explained that while he had been provided a "grainy black and white Xerox copy" of the

---

[18] In this study, which was not peer reviewed, a group of law students was asked to compare the petitioner's photograph with the photographic array including the other Sheldon Thomas's picture, and to decide whether the petitioner's photograph was in the array. According to the study, "a vast majority" concluded that the petitioner was not in the array.

21

array as part of the discovery materials, he did not see the color copy of the array until the suppression hearing. (*Id.*)

Counsel affirmed that he told the petitioner that "we had a great issue to raise that would question both the reliability of the witness' identification as well as the credibility of the police tactics." Counsel "pursued and argued this strategy vigorously" at the pre-trial hearings and the trial. Counsel specified that his strategy was "never to imply" that the other Sheldon Thomas was one of the shooters. (*Id.* at 350.) Instead, counsel's "sole purpose" in discussing the other Sheldon Thomas and the police failure to investigate him was to "contend that because the police had been insistent" that the petitioner was one of the shooters, they were "willing to influence the eyewitness identifications to that effect." The best evidence of this theory, counsel explained, was Aliyah Charles' identification of someone that the police believed was the petitioner. (*Id.* at 350-52.)

On June 5, 2012, Judge Del Guidice denied the petitioner's motion. (ECF 35-54 at 1.) The court ruled that the petitioner's claims about the identification evidence were procedurally barred by 440.10(2)(a), since the Appellate Division rejected these claims on direct appeal. The court also ruled that the petitioner could have made his claims of prosecutorial misconduct on direct appeal, and thus they were procedurally barred by 440.10(2)(b). Judge Del Guidice concluded that trial counsel provided "meaningful representation" and "employed a trial strategy that might well have been pursued by a reasonably competent attorney." (*Id.* at 8-10.) Finally, the court found that the study submitted by the defense was not newly discovered evidence but merely "newly created evidence." (*Id.* at 11-13.)

The Appellate Division affirmed the denial of the petitioner's motion to vacate his conviction. *People v. Thomas*, 131 A.D.3d 551 (2d Dep't 2015). The Appellate Division agreed with the trial court's decision that the petitioner's complaints about the eyewitness testimony were

procedurally barred, and that the defense study was not newly discovered evidence. The court also rejected the petitioner's ineffective assistance of counsel claims. In particular, the court held that counsel was not ineffective for failing to argue that the police should have employed a blind line-up procedure; according to the court, that argument "lacked merit," since neither the New York Court of Appeals nor the state legislature required the use of any specific procedure. *Id.* at 552. As for counsel's overall performance, the court held that the petitioner "failed to demonstrate the absence of strategic or other legitimate explanations for counsel's allegedly deficient conduct," and that "the evidence, the law, and the circumstances of the case, viewed in totality as of the time of the case, reveal that counsel provided meaningful representation." *Id.*

The Court of Appeals denied leave to appeal on January 15, 2016. *People v. Thomas*, 26 N.Y.3d 1112 (2016). The petitioner filed this amended petition on February 18, 2016.

## DISCUSSION

### 1. Legal Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), requires that a federal court reviewing a state prisoner's habeas petition give deference to a state court's decision on the merits. 28 U.S.C. § 2254(a). The federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary

23

to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[19]

### 2. Analysis

The petitioner raises two claims in his petition, both of which New York's courts resolved against him: that the line-up and in-court identifications violated the Fourth Amendment violation, and that his trial counsel was ineffective. For the reasons that follow, I reject both arguments.

#### a. *Fourth Amendment Claim*

Federal habeas relief is not available on a Fourth Amendment claim "where the State has provided an opportunity for full and fair litigation of [the] claim." *Stone v. Powell*, 428 U.S. 465, 482 (1976); *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). Under this standard, there are only two circumstances in which a habeas court will review a Fourth Amendment claim: (1) "if the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations" or (2) "if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan*, 975 F.2d at 70. Neither circumstances are present in this case.[20]

---

[19] Moreover, a petitioner can seek federal habeas corpus relief only after he exhausts state court remedies, giving the state courts a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

[20] The petitioner's citation to *Young v. Conway*, 698 F.3d 69 (2d Cir. 2012), for the proposition that his Fourth Amendment claim is cognizable, is unavailing. In *Young*, the Second Circuit held that *Stone v. Powell*'s limitation on federal habeas relief is non-jurisdictional and can be waived by the government. *Id.* at 85. The state did not waive its *Stone v. Powell* defense, so *Young* is inapplicable.

New York Criminal Procedure Law Section 710.60 is the "corrective procedure" that entitles a criminal defendant to move to suppress evidence on the grounds that it was illegally obtained. It is well established that New York's procedures for evaluating Fourth Amendment claims are constitutionally sound. *See Capellan*, 975 F. 2d at 70 n.1; *Lopez v. Lee* No. 11-cv-2706, 2011 WL 6068119, at *9 (E.D.N.Y. Dec. 7, 2011); *Kelly v. Conway*, No. 10-cv-3053, 2011 WL 3555823, at *3 (E.D.N.Y. Aug. 11, 2011).

In this case, the state court held a lengthy pretrial suppression hearing at which the petitioner fully litigated his Fourth Amendment claims. Based on the evidence at the hearing, the court concluded that the police had probable cause to arrest the petitioner and that the identification procedures were not unduly suggestive. The petitioner has not demonstrated that there was any "breakdown" in the process that would give rise to a cognizable habeas claim, nor have I found any in my review of the hearing transcript.

In any event, the petitioner's principal argument—that the process was deficient because the police did not employ a blind line-up procedure—is unpersuasive.[21] As the Appellate Division observed, New York does not mandate a specific identification procedure, as long as the procedure employed is not unduly suggestive. *Thomas*, 131 A.D.3d at 552; *see also People v. Robinson*, 8 A.D.3d 95 (1st Dep't 2004) (New York state courts do not require blind line-ups); *People v. Fort*, 146 A.D.3d 1017 (3d Dep't 2017) (same). Nor is there any federal authority for the proposition that the police must use a blind line-up. *See Johnson v. LaValley*, No. 11-cv-3863, 2014 WL 285089, at *16 (S.D.N.Y. Jan. 24, 2014) (claim that a criminal defendant is entitled to a blind line-up "is not supported by any federal legal authority."). Rather, a "traditional line-up" is sufficient

---

[21] A blind line-up is one in which "the officer conducting the line-up has no knowledge of the facts of the investigation and does not know whether any suspect is present in the line-up." *Thompson v. City of New York*, 603 F. Supp. 2d 650, 655 (S.D.N.Y. 2009).

so long as it is not "unduly (or unnecessarily) suggestive." *Id.* at *14.

An identification procedure is unduly suggestive when "under all the circumstances of the case there is a very substantial likelihood of irreparable misidentification." *LaValley*, 2014 WL 285089, at *16. Moreover, "if the court finds that the identification was independently reliable, then the identification testimony may be admitted notwithstanding the defects in the pretrial procedures." *Id.* Here, the trial court noted that the line-up participants were reasonably similar in appearance, and that the police took steps to minimize any differences, including having the participants seated and using shower caps cover the participants' hair. Thus, the trial court's conclusions that the line-up was proper and that the officers had probable cause to arrest the petitioner are supported by the evidence.[22] The petitioner's challenge to the state court's suppression decision is nothing more than a disagreement with the outcome of the hearing, which does not establish an "unconscionable breakdown" of process. *See Ortiz v. Ercole*, No. 07-cv-4667, 2010 WL 1688444, at *1 (E.D.N.Y. Apr. 26, 2010). Accordingly, his Fourth Amendment claims are denied.

### b. *Ineffective Assistance of Counsel*

The petitioner's second challenge is to his trial lawyer's performance, both at the suppression hearing and at the trial. The petitioner says that his lawyer was ineffective for failing to argue that the police should have conducted a blind line-up, and that certain strategic decisions at the trial amounted to deficient representation. New York's courts rejected these claims on the merits. In affirming the trial court's 440.10 decision, the Appellate Division held that the attorney could not have been ineffective for failing to argue that the line-up should have been blind, since

---

[22] The petitioner's state appellate counsel, in his affirmation in connection with the petitioner's state claim of ineffective assistance of appellate counsel, pointed out that since Charles had seen the petitioner before the shooting, the identification was confirmatory.

New York has no such requirement. *Thomas*, 131 A.D.3d at 552.

The court also ruled that the petitioner had not established an "absence of strategic or legitimate explanations" for counsel's decisions, and that counsel had in fact "provided meaningful representation." AEDPA precludes relitigation of a claim that a state court has adjudicated on the merits except in two very limited circumstances: when the decision was "contrary to, or involved an unreasonable application of, clearly established federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In the context of this case, the relevant inquiry is whether the Appellate Division's determination that counsel rendered effective assistance was an unreasonable application of clearly established law, in particular, *Strickland v. Washington*, 466 U.S. 668 (1984). The Supreme Court has advised that this inquiry is "different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Rather, a state court must be granted a "deference and latitude that are not in operation when the case involves a review under the *Strickland* standard itself." *Id.* A federal court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision," and must then determine "whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* at 102. The standard was "meant" to be an exacting one; a state habeas petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 102-03.

27

Of course, the *Strickland* standard is itself an exacting one, and requires that a petitioner challenging his attorney's performance overcome the "strong presumption" that counsel's performance fell within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Because a claim of ineffective assistance "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial . . . the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel was meant to serve." *Id*. (citations omitted).

Moreover, the trial lawyer has the unique advantage, unlike a reviewing court, of seeing the witnesses and evaluating their demeanor, and observing the jurors and their reactions to witnesses. The lawyer has access to information that is not on the record, and interacts with his client, his adversary, and the court. "It is 'all too tempting' to 'second-guess counsel's assistance after a conviction of adverse sentence." *Harrington*, 562 U.S. at 105 (citations omitted).

Thus, an evaluation of counsel's performance is "highly deferential," and the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The relevant inquiry focuses "on the fundamental fairness of the proceeding whose results are being challenged." *Id*. at 696. The "central concern is not with grading counsel's performance but with discerning whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir. 1990) (internal quotations omitted).

Viewed by these standards, the state court's decision was not an unreasonable application of clearly established federal law.

### i. *The Pre-Trial Hearing*

The petitioner argues that his trial lawyer was ineffective at the suppression hearing, and "incompetently litigated" the Fourth Amendment claims at the suppression hearing. The record soundly refutes this claim. It was defense counsel who discovered that Aliyah Charles did not identify the petitioner's photograph in the array, and that she identified with 90 percent certainty the photograph of another person, whose name also happened to be Sheldon Thomas. In addition, counsel's cross examination of Detectives Martin and Reedy was thorough and effective, one consequence of which was that Detective Reedy had to consult a lawyer. Counsel also established that once Detective Martin realized that the wrong person was in the photographic array—which happened only after he showed the array to the petitioner—the detective made no notes of the error nor alerted the assistant district attorney on the night of the petitioner's arrest.

Based on the testimony that he elicited, counsel was able to argue that because no witness identified the petitioner, the police did not have probable cause to arrest him and place him in a line-up, and that the line-up identification should be suppressed as the fruit of an unlawful arrest. Counsel also argued that the police witnesses were generally incredible. While these arguments did not persuade the trial judge, the decision to pursue them was eminently reasonable, as was Judge Del Guidice's decision to deny the ineffective assistance claim on this ground.[23] *See Gatto v. Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y.), *aff'd*, 986 F.2d 500 (2d Cir. 1992) ("An attorney who presents a well-grounded, but ultimately unsuccessful defense, will not later be held to have provided ineffective assistance of counsel.").

### ii. *The Trial*

The petitioner argues that "counsel elicited damaging, prejudicial, otherwise inadmissible,

---

[23] As explained above, since there is no right to a blind line-up, counsel was not ineffective for failing to challenge the identification procedures on that basis.

and unreliable evidence against his own client" during the course of the trial. He focuses principally on two decisions that counsel made: to question Aliyah Charles about her prior encounters with the petitioner, which led to her testimony that she saw him and a girlfriend "shoot people and beat them up," and his decision to call one of the investigating detectives, which led to testimony that Freddy Patrice identified the petitioner in a line-up. However, courts afford "significant deference . . . to a trial counsel's decision [regarding] how to conduct cross examination" and have "refus[ed] to use perfect hindsight to criticize unsuccessful trial strategies." *Eze v. Senkowski*, 321 F.3d 110, 132 (2d Cir. 2003); *see, e.g. Nowicki v. Cunningham*, No. 09-cv-8476, 2011 WL 12522139, at \*6-7 (S.D.N.Y., Mar. 30, 2011) (report and recommendation) (defense counsel's decisions to elicit and not to object to testimony that recounted victims' description of attacks was trial strategy and not ineffective assistance); *Charles*, 516 F. Supp. 2d at 219-220 (defense counsel was not ineffective in eliciting testimony about a prior photographic array identification, as it was consistent with the defense theory of misidentification).[24]

The record as a whole demonstrates that counsel pursued a reasonable strategy—undercutting the identification evidence and casting doubt on the police investigation—a strategy

---

[24] *Wilson v. Mazzuca*, 570 F.3d 490, 503 (2d Cir. 2009) does not compel a different result. Wilson's attorney elicited damaging evidence, did not object to obviously inadmissible evidence, and called a character witness, opening the door for the prosecutor to question her about all of Wilson's prior bad acts, tactics that the Second Circuit characterized as "incomprehensible." *Id.* at 504. There was no discernible strategy for any of counsel's actions, and he did not seem to know what was in damaging reports that he introduced or to understand the legal ramifications of some of the things that he did; even when called to explain his tactics in the district court, counsel did not articulate any meaningful strategy, and said at one point that he did not object to obviously prejudicial evidence because he "wanted to get on with the case." *Id.* The trial judge expressed his concerns with the quality of counsel's representation throughout the trial. Near the end of the trial, the judge took the extraordinary step of raising the issue of ineffective assistance on his own, saying that he was "becoming increasingly disturbed and I'm going to put it right on the record, that some of the decisions apparently made by the defense in this case . . . The alarm bells are ringing in my head and I'm going right on the record. And the question concerns the representation of the defendant." *Id.* at 506. Counsel's decisions in this case, on the other hand, were part of a reasonable, if ultimately unsuccessful strategy. And the trial judge expressed no concerns about counsel's competence or the choices he made. On the contrary, he praised counsel as a "skilled litigator" and "a good lawyer," and remarked that it was "a pleasure to watch such a tactician as yourself." (ECF 35-24, at 8, 11).

that he laid out at various points during the trial and in his affidavit in connection with the petitioner's 440.10 motion. To that end, the petitioner's trial counsel focused on the evidence that Aliyah Charles identified another person, with 90 percent certainty, and the coincidence that the person she selected was also named Sheldon Thomas, which counsel argued suggested police misconduct. And, the cross-examinations by both the petitioner's attorney and the co-defendant's attorney centered on Charles' overall credibility, including her claims that she could see details from a second floor window, the internal contradictions in her testimony, her statements to police, and the inconsistencies between her testimony and that of other witnesses.[25]

The petitioner's counsel also attacked the police investigation as incomplete and unreliable. However, because the prosecution did not call either of the investigating detectives to testify, there was no evidence about the investigation or the circumstances surrounding the line-up. Counsel's decision that the jury should hear about the investigation—including the botched photographic array and the details about the other Sheldon Thomas—was reasonable. An examination of Detective Martin's testimony shows that counsel succeeded in raising questions about the investigation; he established that the other Sheldon Thomas also lived near the shooting, that the detectives considered him a suspect, and that they did no investigation of him at all.

It is of course true that in pursuing these strategies, counsel elicited testimony that was objectively unfavorable, including Charles' claim that she had seen the petitioner engage in violent acts and Martin's testimony that Patrice identified the petitioner in a line-up. But counsel considered these risks when he made the strategic decision to attack the identification evidence and the police conduct, and counsel decided that the downside of attacking the identification

---

[25] Because there were two defense attorneys in this case, I consider co-counsel's tactics "in assessing the reasonableness of [the petitioner's] counsel's performance;" the petitioner's counsel could have decided not to duplicate what his co-counsel had already done, or to leave areas of cross-examination to him. *Eze*, 321 F.3d at 126.

evidence and the police investigation was outweighed by the benefits. The petitioner's attorney, who had the advantage of observing the witnesses and the jury's reaction to them, could rationally have decided that the jury might reject Aliyah Charles' testimony because of its inconsistencies or her demeanor, and Detective Martin's testimony about Freddy Patrice, since Patrice himself denied making an identification, and had told the 911 operator that he did not see the shooter. These decisions were not irrational. Attacking the police investigation and identification testimony are fairly standard defense tactics. Indeed, had counsel not pursued the evidence that a witness made a positive identification of a different person, or explored the deficiencies in the investigation, he might well have been attacked for ineffective assistance.

The fact that Dalton Walters was acquitted does not support the petitioner's claim that his lawyer was ineffective. The case against Walters was far weaker. Aliyah Charles, whose credibility was tested by both attorneys, was the only witness to identify Walters as the shooter or place him at the scene. The other witnesses testified either that they did not see the shooting, or provided testimony that was helpful to Walters. Another target of the shooting, Kadeem Drummond, testified that he considered Walters as "a big brother." (ECF 35-22, at 60-62.) And, Kirk Lapaix testified that right before the shooting, Walters called him on the phone and he heard noise in the background. (*Id.* at 55-58.) Walters also called an alibi witness who said Walters was playing video games at a laundromat at the time of the shooting, testimony that tended to corroborate Lapaix's testimony that he overheard voices in the background when Walters called him moments before the shooting. The evidence against the petitioner, by contrast, was more compelling. Indeed, the witness who gave the most damning testimony against the petitioner was not Aliyah Charles, but Daymeon Smith; he was only five feet from the shooting and identified the petitioner, whom he knew, as one of the gunmen.

Viewed in context, counsel's actions were part of a consistent—albeit unsuccessful—strategy, and his representation did not fall below the objective standard of reasonableness. Even if counsel had been ineffective—and he was not—the petitioner must also establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 669. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Counsel's actions are evaluated within the context of the evidence supporting conviction and the strength of the petitioner's case. *See Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001).

The Appellate Division characterized the evidence of the petitioner's guilt as "overwhelming." *Thomas*, 65 A.D.3d at 1172. This decision was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence. Two eyewitnesses testified that the petitioner was in the car from which two shots were fired, and one of those witnesses—Daymeon Smith—was only five feet from the shooter and knew the petitioner. Defense counsel challenged the prosecution's case and the credibility of the witnesses, but was unsuccessful. Even if the petitioner had shown that counsel was ineffective, the state court's conclusion that there is no reasonable probability that the outcome would have been different had counsel pursued a different strategy was not unreasonable.

In sum, the petitioner failed to show that his lawyer's performance fell below an objective standard of reasonableness or that there is a reasonable probability that the alleged errors affected the outcome of the trial. The decisions of the trial court and the Appellate Division were neither contrary to nor an unreasonable application of *Strickland*.

## CONCLUSION

The petition for writ of habeas corpus is denied in its entirety. The case is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

s/Ann M. Donnelly

Ann M. Donnelly
United States District Judge

Brooklyn, New York
November 28, 2017